**Joachim HAGOPIAN, Plaintiff-Appellee,**

v.

**Major General William KNOWLTON et al., Defendants-Appellants.**

**No. 253, Docket 72-1941.**

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1972.

Decided Oct. 31, 1972.

Frank H. Wohl, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Southern District of New York, of counsel), for defendants-appellants.

Joan Goldberg, New York City (Rabinowitz, Boudin & Standard, Michael Krinsky, Herbert Jordan, New York City, of counsel), for plaintiff-appellee.

Before KAUFMAN, SMITH and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

The Superintendent of the United State Military Academy at West Point (the "Academy"), the Commandant of the Academy, and the Secretary of the Army appeal pursuant to 28 U.S.C. § 1292(a) from an order, 346 F.Supp. 29, granting preliminary injunction restraining them from ordering Joachim Hagopian, a former third-year cadet, to active duty and requiring them to re-admit him to the program of instruction and training at the Academy, which for 170 years has been engaged, at government expense, in training volunteer members of the military service in academic, military, character and physical development with a view to their becoming career officers in the United States Army.

Cadet Hagopian was separated from the Academy for deficiency in conduct after receiving 107 demerits as of May 21, 1972, 5 demerits in excess of the 102-demerit allowance prescribed as a maximum for the period December 21, 1971 to June 7, 1972.[1] Separation de-

---

1. The demerit allowance is determined for each cadet class according to a mathematical formula which depends on the number of days the class is on duty status during each of the two demerit periods per year. Regulations for the United States Corps of Cadets, 407, 408 (1971) (hereinafter "Cadet Reg."). The Academy year is divided into two demerit periods. A cadet who exceeds his demerit allowance for a full demerit period is deficient in conduct and may be separated

prives Hagopian of the opportunity to complete his college education at the Academy and thereby to become a commissioned officer in the United States Army. It also subjects him to transfer to active duty "in an appropriate enlisted grade" for not less than two nor more than four years. 10 U.S.C. § 4348(b) (1972 Supp.); Regulations for the United States Military Academy 16.01e (March 15, 1971) (hereinafter "Academy Reg.").

In this action Hagopian challenges, for alleged failure to comport with minimum due process requirements, the procedures by which demerits for Class III delinquencies[2] are initially awarded and the procedures followed by the Academy's Academic Board in determining whether a cadet whose accumulated demerit awards exceed his allowance for a demerit period should be recommended for separation. We hold that the existing measures presently available to a cadet for contesting an *individual award of demerits* are sufficient to meet minimum standards of due process, but that when an *accumulation of awarded demerits* renders the cadet subject to separation, he must be granted a fair hearing before being separated, including the right to personally appear and to present witnesses and other evidence in his behalf. As Cadet Hagopian was denied these rights at the meeting of the Academic Board which recommended his separation, we affirm the judgment below.

I.

At the outset we emphasize that we are not here being called upon to modify the Academy's rigorous and exacting standards of discipline, behavior and personal decorum for cadets, standards which have traditionally been recognized as vital elements of a training program designed to develop the mind, body and character of prospective career officers. The ultimate objective of that training is to insure that when our country faces the all-important task of defending itself, Academy graduates will provide military leadership under stress, imbued with courage, a strong sense of duty, and a willingness to subordinate personal self-interest to the overriding needs of their country. Such important matters, which are part of the Army's conduct of military affairs and the standards adopted by it to prepare men for military operations, should not be interfered with by the judiciary. See Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Nor do we here seek to depart from that basic principle. The narrow question before us relates to a different matter. The Army's disciplinary standards are not here challenged. The question before us is the narrow and limited one of what minimum procedural due process must be accorded a cadet before he may be separated from the Academy.

Since the elements of due process are flexible, requiring consideration in each case of a variety of circumstances, it

---

from the Academy, Cadet Regs. 408C, 409C, or placed on probation, depending upon whether the Academic Board concludes that notwithstanding his demerits his "potential warrants retention."

2. Under the Academy's disciplinary system, delinquencies are classified according to seriousness. Class I delinquencies, for which more than 15 demerits may be awarded, and Class II delinquencies, for which 9 to 15 merits may be awarded, Cadet Reg. 403, require action by a board within the Department of Tactics. Disciplinary System-Standing Operating Procedure § 28 (hereinafter "Disciplinary

SOP"). Though part of Hagopian's demerit total resulted from the award of 25 demerits for a Class I delinquency during this period, he does not challenge the procedure which led to this award. Rather, he challenges the procedure followed in awarding him the remainder of his demerit total which arose from fifteen separate Class III delinquencies. Class III delinquencies are of a minor nature, e. g., possession of unauthorized articles or uniform violations, and 1 to 8 demerits may be awarded for each delinquency by the Company Tactical Officer without the need for board action, Cadet Reg. 403C.

is essential to have a full understanding of the present operation of the disciplinary system at the Academy as it relates to the separation of a cadet for deficiency in conduct of the type which formed the basis of the Academy's decision in Hagopian's case. Preliminarily it should be noted that the Academy's disciplinary system as a whole is characterized as "correctional and educational in nature rather than being legalistic and punitive." [3] Its purpose is to teach the cadets "to be prepared to accept full responsibility for all that they do or fail to do and to place loyalty to the service above self-interest or loyalty to friends or associates." [4] Toward these ends the awards of demerits to cadets at the Academy serve a dual function. In the daily educational context demerits are awarded so that cadets will be deterred from committing infractions of the Academy's standards and, hence, will develop the kind of discipline the Academy hopes to inculcate in future Army officers. In the far less frequent context, however, the accumulation of demerits to the point of conduct deficiency serves as a measure used to determine whether a cadet should be expelled from the Academy.

The award of demerits for a Class III delinquency begins with a report by an officer, civilian instructor, or another cadet,[5] forwarded to the allegedly delinquent cadet's Tactical Officer.[6] The Tactical Officer may initiate the delinquency report himself and did so here as to 7 offenses (out of a total of 16) for which Hagopian received 46 demerits. The Tactical Officer notifies the cadet of any report, and he may request an Explanation of Report or the cadet may on his own submit one to contest the delinquency.[7] The Tactical Officer reviews reports (including his own) and explanations and takes final action on all Class III offenses.[8] The individual report form with a notation of the demerits awarded is returned to the cadet and, in addition, a Weekly Cadet Delinquency Report is posted each week to notify the cadet of his offenses for the past week for which demerits were awarded, as well as to notify him of cumulative totals for the month and for the demerit period.[9]

If a cadet wishes to appeal any demerit award listed, he must submit a request for reconsideration to the Tactical Officer by 8:00 A.M. of the day following the posting of the weekly report, and the award of demerits will be considered by the next higher authority, the Regimental Commander.[10] It is also possible for the cadet to seek further review from the Superintendent of the Academy if he feels he has been wronged,[11] or to initiate a complaint, through his chain of command, to the Inspector General.[12] In the normal course, before a cadet exceeds his demerit allowance, these latter avenues of appeal are likely to be used only in rare instances.

The accumulation of demerits as a result of several individual awards may activate the other aspects of the disciplinary system with which this case deals. If a cadet exceeds his demerit allowance for a month or for the entire demerit period, the Tactical Officer is directed to interview the cadet to determine that all awards are correct and just and to have the cadet sign a form to that effect.[13] On such occasions the Tactical Officer counsels the cadet with a view to assisting him to mend his

3. Cadet Reg. 401.

4. *Id.*

5. Cadet Reg. 404.

6. Disciplinary SOP § 14b.

7. *Id.* §§ 14d, 19; Cadet Reg. 405.

8. Disciplinary SOP § 14e. He refers Class I and II offenses for appropriate board action.

9. *Id.* §§ 14h, 16a.

10. *Id.* § 20.

11. Cadet Reg. 201e.

12. Cadet Reg. 320.

13. Disciplinary SOP § 21.

ways and to avoid further infractions. Where the deficiency in conduct is based upon the cadet having exceeded his allowance for a full demerit period, as here, his case is forwarded through the Regimental Commander and the Commandant of Cadets to the Academic Board,[14] which may recommend probation only if the cadet is one "whose potential warrants retention" and which otherwise must recommend separation.[15] Formal approval of a recommendation to separate a cadet is finally taken by the Secretary of the Army.[16]

The Academic Board, which makes the fateful recommendation to separate or retain on probationary status a cadet deficient in conduct, is composed of the Superintendent, the Dean of the Academic Board, the Commandant of Cadets, and the heads of the several departments, totalling 18 members.[17] This body has general responsiblity, *inter alia,* for decisions on admissions, qualifications for receipt of diplomas, curriculum, and probation and separation of cadets.[18] A cadet who is being considered for separation by the Board for deficiency in conduct [19] may submit any additional written material for the Board to consider in reaching its decision,[20] but may not appear before the Board personally or through counsel and may not present witnesses in his behalf.

## II.

On June 8, 1972, the Academic Board recommended that Cadet Hagopian be separated from the Academy, and on June 27, 1972, the Secretary of the Army approved the separation. This lawsuit followed on June 30, 1972, seeking preliminary and permanent relief based on an alleged denial of procedural due process. Hagopian concedes that the demerit award and separation procedures pre-scribed by the Regulations were followed in his case and that he submitted only one request for reconsideration of an award (which was successful) prior to May 22 and 23, 1972, at which time he sought to dispute the factual basis for incidents which had occurred on January 18, April 27, and May 21, 1972. The latter requests for reconsideration were rejected. His deficiency in conduct was referred to the Academic Board with recommendations of his Tactical Officer and his Regimental Commander that he be separated. On May 25, 1972, Hagopian signed the form which indicated that all reports were just and correct and that he had submitted all required requests for reconsideration.

Hagopian was notified by letter dated May 31 that his deficiency in conduct had been referred to the Academic Board for possible separation and that he had the right to present written evidence not previously submitted. He availed himself of this opportunity by a letter dated June 2, 1972, in which he did not dispute his delinquencies but appealed for another chance because he now realized his mistakes in "bucking the system." In his affidavit to the district court Hagopian alleged that shortly after he was notified on June 7 that the Board would be meeting the following day to consider his case he phoned the Academy legal department seeking advice and was told by one of the attorneys that they "were discouraged from counselling cadets who were called to appear before conduct boards." Since Hagopian was not to appear before the Academic Board, it is unclear whether the term "conduct boards" was meant to include the Academic Board meeting to consider separation, or referred only to boards convened to adjudicate demerit awards for Class I and II delinquen-

---

14. *Id.*

15. Dean's Standing Operating Procedure, Item XXIV c. 3 (May 12, 1969).

16. Academy Reg. 16.09.

17. Academy Reg. 3.01.

18. *Id.* 3.06.

19. The Board considers deficiencies in conduct in the same manner as it treats deficiencies in studies. Academy Reg. 9.05.

20. Disciplinary SOP § 21; Rules of the Academic Board 5.01b.

cies.[21] In any event, no legal advice was given and Hagopian confined his written efforts to the letter appealing for another chance, presumably hoping that his promise to do better in the future might persuade the Board members to find him to be a cadet "whose potential warranted retention." It is undisputed, however, that if any of the demerit awards which Hagopian challenged in his requests for reconsideration in May or the demerit award he challenged for the first time in the district court[22] had been set aside by the Academic Board at its meeting, he would not have exceeded his allowance for the demerit period and would, therefore, not have been subject to separation for deficiency in conduct.

## III.

██ Upon this appeal the district court's grant of preliminary relief could be affirmed solely for failure to show any abuse of discretion on the part of the district court, Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 500 (2d Cir. 1962); Dino De-Laurentiis Cinematografica, S.p.A. v. D-150, Inc., 366 F.2d 373 (2d Cir. 1966), since the relative hardships of granting or withholding relief tip decidedly in favor of Hagopian, who will suffer irreparable harm if the preliminary injunction is vacated, and he has not only raised issues presenting "a fair ground for litigation," Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953), but has demonstrated a probability of success on the merits. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L. Ed.2d 777 (1969). However, no material issues of fact appear and the parties seemed to agree upon the argument of the appeal that the dispute centers on the sufficiency, as a matter of law, of the Academy's procedures. Thus, despite the absence of an agreement to consolidate trial on the merits with the hearing of the application for preliminary relief, as permitted by Rule 65, F.R.Civ.P., we accede to the obvious necessity for a delineation of the basic contours of the due process requirements to be applied to the Academy's disciplinary procedures rather than defer that decision until a further appeal which would follow the grant of permanent relief.

██ In approaching the question of what process is due before governmental action adversely affecting private interests may properly be taken, it must be recognized that due process is not a rigid formula or simple rule of thumb to be applied undeviatingly to any given set of facts. On the contrary, it is a flexible concept which depends upon the balancing of various factors, including the nature of the private right or interest that is threatened, the extent to which the proceeding is adversarial in character, the severity and consequences of any action that might be taken, the burden that would be imposed by requiring use of all or part of the full panoply of trial-type procedures, and the existence of other overriding interests, such as the necessity for prompt action in the conduct of crucial military operations. The full context must therefore be considered in each case. It could hardly be contended, for instance, that disciplinary action on the field of battle must conform to procedures applicable to the demotion of a civilian employee on the home front.

"Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature

---

21. See note 2 *supra*.

22. Cadet Hagopian received 5 demerits each for being in need of a haircut on both the 25th and 26th of April. He raised the objection below that he did not have the opportunity to rectify the cause of the first delinquency before it resulted in a second demerit award, although he had not raised this objection prior to his separation.

of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L. Ed.2d 1307 (1960).

■■■ With respect to decisions made by Army authorities, "[o]rderly government requires us to tread lightly on the military domain, with scrupulous regard for the power and authority of the military establishment to govern its own affairs within the broad confines of constitutional due process", Friedberg v. Resor, 453 F.2d 935, 937 (2d Cir. 1971). See Orloff v. Willoughby, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L. Ed. 842 (1953); Cortright v. Resor, 447 F.2d 245 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).[23] Accordingly we agree with appellants that in deciding what process is due in both phases of this case, we should not apply automatically the full dress standards required for hearings to revoke probation, Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), or parole, United States ex rel. Bey v. Connecticut State Bd. of Parole, 443 F.2d 1079 (2d Cir.), vacated as moot, 404 U.S. 879, 92 S.Ct. 196, 30 L.Ed.2d 159 (1971), or for proceedings which have been described as involving the "operation of the criminalization and incarceration process beyond the determination of guilt at trial," Sostre v. McGinnis, 442 F.2d 178, 196 (2d Cir. 1971), cert. denied Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The factors involved in expulsion from a

government-service academy also differ substantially from those found significant in proceedings to challenge the standards of due process required for termination of welfare payments, Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1967); or of tenancy in public housing, Escalera v. New York City Housing Authority, 425 F.2d 853 '(2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970).

At first blush separation of a cadet from the Academy appears similar to the involuntary activation of a ready reservist for failure to perform satisfactorily in the reserve, for which no hearing is required. See O'Mara v. Zebrowski, 447 F.2d 1085 (3d Cir. 1971); Antonuk v. United States, 445 F.2d 592 (6th Cir. 1971); Ansted v. Resor, 437 F.2d 1020 (7th Cir.), cert. denied, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971). In both cases the immediate consequence—assignment to active duty—is the same. However, a closer study discloses a vast difference in the sanctions ultimately to be applied. Although a ready reservist may, without hearing, be ordered to active duty upon a determination by his commanding officer, within his statutory discretion, that the reservist has not participated satisfactorily in the reserve program (e. g., for failure to attend drill sessions)[24] the consequence is limited primarily to changing the form of service required to satisfy his voluntarily assumed military obligation from reserve to active. While it is true that such a reservist could be ordered to active duty even if his total period of enlistment would be extended thereby, see

---

23. Of course, where military "regulations prescribed specific steps to be taken to insure due process they must be substantially observed," Friedberg v. Resor, *supra*, 453 F.2d at 938. See United States ex rel. Donham v. Resor, 436 F.2d 751 (2d Cir. 1971). No claim is made in this case that the Academy failed to follow its own procedures.

24. See Winters v. United States, 281 F. Supp. 289 (E.D.N.Y.), affd., 390 F.2d 879 (2d Cir. 1968); Fox v. Brown, 402 F.2d

837 (2d Cir. 1968), cert. denied, 393 U.S. 1114, 89 S.Ct. 1007, 22 L.Ed.2d 120 (1969). See also Raderman v. Kaine, 411 F.2d 1102 (2d Cir.), petition for cert. dismissed, 396 U.S. 976, 90 S.Ct. 467, 24 L.Ed.2d 447 (1969). Compare United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969) (reservist activated with unit denied judicial review of rejection of his claim for hardship exemption).

Fox v. Brown, 402 F.2d 837, 841 (2d Cir. 1968), cert. denied, 393 U.S. 1114, 89 S.Ct. 1007, 22 L.Ed.2d 120 (1969), any extension which might possibly occur is still confined at most to the amount of time necessary for the reservist to serve a total of 24 months on active status. 10 U.S.C. § 673a(b) (1972 Supp.). The Academy cadet, on the other hand, faces the far more severe sanctions of being expelled from a course of college instruction which he has pursued with a view to becoming a career officer and of probably being forever denied that career.

Because of the factors controlling what process is due usually vary from case to case, prior decisions on the subject cannot ordinarily furnish more than general guidelines which might give the reader a "feel" for what is fundamentally fair in a particular instance. In this case, however, we have the unusual benefit and guidance of a decision of this Court in Wasson v. Trowbridge, 382 F. 2d 807 (2d Cir. 1967), which dealt with the requirements of procedural due process in a factual context that is strikingly similar to the one with which we are now faced. Wasson was a third-year student at the Merchant Marine Academy at Kings Point, New York, whose dismissal, after a hearing at which he was allowed to appear, was recommended by the Senior Board of Aptitude, Conduct and Discipline Review following his accumulation of demerits in excess of the maximum allowance. That Board, similar to the Academic Board here, had the function of determining "whether or not the Cadet should be retained." Wasson had exceeded his demerit allowance and thereby became subject to dismissal because, in addition to demerits previously accumulated, he had been awarded a substantial number of demerits at an earlier hearing concerning a Class II offense.[25] He challenged the denial of counsel at both hearings and charged that members of the panel which awarded the demerits had participated in the investigation of the Class II offense against him. He further alleged that he had been denied a continuance to obtain favorable witnesses, had been given inadequate time to prepare to defend himself at the hearing, and had never been fully advised of the evidence against him. We reversed the district court's denial of a hearing, which had been based on the ground that the allegations of the complaint did not amount to a denial of due process, and held that Wasson was entitled to an evidentiary hearing on whether "the procedures used against [him] comported with due process of law." 382 F.2d at 813. In doing so, the Court took note of the special context in which procedures leading to expulsion of a cadet from a military service academy operate and set forth in broad outline and in language particularly relevant to the present case the minimum standards of due process which would be applicable in such a setting:

"While the government must always have a legitimate concern with the subject matter before it may validly affect private interests, in particularly vital and sensitive areas of government concern such as national security and military affairs, the private interest must yield to a greater degree to the governmental. . . . Few decisions properly rest so exclusively within the discretion of the appropriate government officials than the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine. Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity—at times extreme—is a matter of substantial national importance scarcely within the competence of the judiciary. And it cannot be doubted that because of these factors historically

25. The classification of offenses at the Merchant Marine Academy is substantially similar to the one prescribed at West Point. See note 2 *supra.*

the military has been permitted greater freedom to fashion its disciplinary procedures than the civilian authorities.

"We conclude, therefore, that due process only requires for the dismissal of a Cadet from the Merchant Marine Academy that he be given a *fair hearing* at which he is apprised of the charges against him and *permitted a defense*. . . . For the guidance of the parties, . . . the rudiments of a fair hearing in broad outline are plain. The Cadet must be apprised of the specific charges against him. He must be given an *adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. We do not suggest, however, that the Cadet must be given this opportunity both when demerits are awarded and when dismissal is considered.* The hearing may be procedurally informal and need not be adversarial.

". . . The requirement of counsel as an ingredient of fairness is a function of all of the other aspects of the hearing. Where the proceeding is non-criminal in nature, where the hearing is investigative and not adversarial and the government does not proceed through counsel, where the individual concerned is mature and educated, where his knowledge of the events . . . should enable him to develop the facts adequately through available sources, and where the other aspects of the hearing taken as a whole are fair, due process does not require representation by counsel." 382 F.2d at 812 (emphasis supplied).

■ We find these standards to be of persuasive and controlling guidance in the remarkably similar context with which we are here confronted. Applying them here, we have little difficulty in sustaining the validity of the Academy's procedures for awarding demerits for individual Class III delinquencies. However, we find inadequate the present procedures which are followed in separating from the Academy cadets who have exceeded their demerit allowance for a prescribed period.

We view the award of demerits for each Class III delinquency not as the conduct of a military operation exempt from interference but as part of the daily operation of the Academy's disciplinary system in which the Tactical Officer is responsible for instilling disciplined conduct in the cadets he supervises in a manner similar to the responsibilities of public school teachers to educate their students. Of course the student voluntarily at a military academy must be prepared to subordinate his private interests to the proper functioning of the educational institution he attends to a greater degree than the student at a civilian public school. However, although the Tactical Officer must decide whether demerits are to be awarded, he is not an adversary of the cadet but an educator who shares an identity of interest with the cadet, whom he counsels from time to time as a future leader. See e. g., Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970). Furthermore, the individual award of demerits invokes at most the relatively minor immediate consequence of disciplinary punishments or withdrawal of weekend or other privileges.[26] We have found more serious sanctions, such as a 15-day suspension from class, still not sufficient to necessitate a hearing. Farrell v. Joel, 437 F.2d 160 (2d Cir. 1971). Not until the cadet accumulates a total of demerits in excess of that allowed for the entire five-month period is he subject to expulsion.

It would be an undue burden to impose on the routine administration of the Academy's disciplinary system the requirements of a hearing, with the attendance of the cadet and witnesses, before an adjudication of demerits for such infractions as a dirty uniform or an unintentional failure to comply with instructions were permitted. Short of

**26.** Cadet Reg. 409.

expulsion, the procedures available to a cadet (explanation of a reported delinquency, request for reconsideration, and appeal to superior authorities) are ample to satisfy the demands of due process, even with respect to demerits awarded by the Tactical Officer for delinquencies reported by the Tactical Officer himself. This is so because the sanctions imposed are slight, the nature of the proceeding is corrective and educational, and the burden on the proceedings which a hearing would impose is excessive, see Hannah v. Larche, *supra*, 363 U.S. at 442, 80 S.Ct. 1502.

The demands of due process, however, are greater when the accumulation of demerits subjects the cadet to the severe sanction of expulsion rather than a form of milder discipline, see Farrell v. Joel, *supra*, 437 F.2d at 162. Cf. Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 152–153, 657, 61 S. Ct. 524, 536, 85 L.Ed. 624 (1941) ("The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective.") Although the Court in *Wasson* declined to apply automatically the hearing requirements set forth in Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) (expulsion of a civilian student for misconduct from a tax-supported college) to the expulsion of a cadet from a military service academy, it did make plain that a fair hearing would be required at some point before a cadet could be separated. Appellants maintain that "holding a full hearing on accumulated demerits for fifteen minor infractions would be nothing more than a meaningless litany." We disagree. The Academic Board has two functions when it is convened to consider separation. First it must determine whether the cadet in question has accumulated an excessive amount of validly awarded demerits over the course of the

demerit period. If so, it must then determine whether the cadet's "potential warrants retention," so as to allow probation rather than separation. Since the demerit period roughly coincides with the relatively short duration of a college semester, the opportunity to appear and contest the factual basis of demerits previously awarded without a hearing would not be lost to the memory of either the cadet or available witnesses. Perhaps more importantly, with respect to certain of the demerit awards and especially with respect to the subjective evaluation of the cadet's potential, the opportunity to personally appear and present his case may affect considerably the credibility which the members of the Academic Board attach to the cadet's appeal. With a cadet population of several thousand, it is unlikely that the members of the Board, drawn from several departments, would have a sufficient acquaintanceship with the cadet to be able to appraise him or determine his "potential for retention" merely on the basis of his letter to it. The opportunity to bring witnesses to appear in his behalf may also strengthen the impact of his case above the frail impression which a written submission would make. "Particularly where credibility and veracity are at issue, . . . written submissions are a wholly unsatisfactory basis for decision", Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970).

While we adhere to the admonition in *Wasson* that the "hearing may be procedurally informal and need not be adversarial," we conclude that at a hearing at which Academy officials will determine whether or not a cadet will be expelled the cadet must be allowed to appear and present evidence, including witnesses, on his behalf. The importance of informality in the prodeeding militates against a requirement that the cadet be accorded the right to representation by counsel before the Academic Board. Unlike the welfare recipient who lacks the training

and education needed to understand his rights and express himself, the cadet should be capable of doing so. However, we reject any intimation that Cadet Hagopian was not entitled to seek advice or retain counsel to assist him in preparing his defense at the hearing.

■ With respect to Hagopian's demand for the right to inspect the recommendations of his Tactical Officer and Regimental Commander recommending separation, which were before the Academic Board when it made its decision, we agree with the Court's conclusion in *Wasson* that "[p]articularly on the question of [his] fitness to remain a Cadet, he is not entitled to see the confidential opinions of members of the faculty", 382 F.2d at 813. However this renders it even more important for the cadet to have an opportunity to appear and present the considerations in his favor. Nor do we believe, as appellants suggest, that providing a fair hearing when a cadet becomes subject to dismissal would deprive the informal procedures for contesting Class III demerit awards when awarded of their impact or utility. Few cadets are likely to be as foolhardy as to risk awaiting the convening of the Academic Board to consider their expulsion from the Academy simply because they will now be entitled to a fair hearing before that body. And because the meetings of the Academic Board to consider expulsion of deficient cadets are infrequent,[27] the additional steps required here should have a minimal impact on the functioning of the Academy and virtually none on the operation of the Academy's disciplinary system.

The foregoing is intended merely to convey, for the guidance of the Academy, the rudiments of due process required for disciplinary proceedings. It will be for the Academy within this rough framework to determine the precise procedures to be employed. In the meantime the judgment of the district court is affirmed.

---

27. Upon oral argument counsel for the Government advised that expulsion hearings number approximately 8 per year.