**Barry S. ZITSER**

v.

**Major General E. Donald WALSH, Adjutant General, Connecticut National Guard, et al.**

**No. Civ. 15094.**

United States District Court,
D. Connecticut.

Dec. 8, 1972.

Arthur P. Meisler, Willimantic, Conn., for plaintiff.

Robert K. Killian, Atty. Gen., F. Michael Ahern, Bernard F. McGovern, Jr., Asst. Attys. Gen., Hartford, Conn., for defendants.

## RULING ON MOTION TO DISMISS

BLUMENFELD, Chief Judge.

Plaintiff Barry Zitser is an enlisted member of the Connecticut National Guard who successfully applied for admission to the Guard's Officer Candidate School (OCS). Upon arrival at OCS, he and his classmates were asked to submit an autobiography. Defendant Colonel Donald J. Acker,[1] the officer in charge of OCS, concluded on the basis of statements critical of military practices made by the plaintiff in this autobiography and in a subsequent interview that the plaintiff would not meet the standards of the applicable regulation, NGR 351–5, para. 7(f):

"(1) The primary emphasis of the State OCS Program will be placed upon the development of desirable leadership traits and abilities of each candidate. Methods of leadership development include rigid discipline, high standards of deportment and conduct and exacting manner of perform-ance, frequent and effective counseling, and continuous observation, correction and evaluation. Training will be conducted in accordance with USCONARC Regulation 350–11, 'OCS Training Policies.'

"(2) A system will be maintained to evaluate the leadership ability of each candidate. Students who fail to show progress in the development of these traits will be dropped from the program."

Plaintiff claims that in grounding their decision to dismiss him from OCS upon the statements made in the autobiography, defendants have violated his first amendment rights, and that the manner of his dismissal deprived him of his fourteenth amendment right to due process. Defendants have moved to dismiss for lack of jurisdiction and, alternatively, for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). These grounds will be separately considered, recognizing that at this stage of the proceedings the plaintiff's allegations of the complaint must be taken as true. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

### I.

### *Jurisdiction*

This action is brought under the Civil Rights Act, 42 U.S.C. § 1983,[2] which creates a federal cause of action against those persons whose misconduct under color of state law violates constitutional rights of another. Jurisdiction to entertain such a claim is authorized by 28 U. S.C. § 1343(3) without regard to any amount in controversy. Lynch v. House-

---

1. The other defendants are Major General E. Donald Walsh, Adjutant General, Connecticut National Guard, Captain James H. Besade, Connecticut National Guard, Lt. Colonel William F. Carpenter, Connecticut National Guard, and Governor Thomas Meskill, the Commander in Chief of the Connecticut National Guard.

2. 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

hold Fin. Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

## A. *State Law*

 In considering whether one essential element for an action under the Civil Rights Act is present, the first question is whether the defendants were acting under color of state law. The National Guard is a lineal descendant of the militia; as such, the Constitution reserves to the states the appointment of its officers. U.S.Const., art. I, § 8, cl. 16; see generally, Wiener, The Militia Clause of the Constitution, 54 Harv.L. Rev. 181 (1940). The dual status of a guard officer is set forth clearly in one of the governing federal regulations, 32 C.F.R. § 564.2(a)(1):

> "The appointment of officers in the Army National Guard is a function of the State concerned, as distinguished from the Federal recognition of such appointment. Upon appointment in the Army National Guard of a State . . . an individual has a State status under which he can function. Such individual acquires a federal status when he is federally recognized and appointed as a Reserve of the Army."

One may be a member of the National Guard of a state without receiving federal recognition, but never the reverse. Thus, when defendants rejected Zitser as unsuitable officer material, they were exercising a state function and preventing him from receiving appointment as an officer in a state organization. Moreover, in Maryland v. United States, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965), the Supreme Court approved a line of cases which held that military members of the Guard are state employees.[3] Under these circumstances,

defendants' conduct, if in derogation of plaintiff's constitutional rights, falls within the boundaries of § 1983.

While Colonel Acker used a federally-promulgated regulation, NGR 351–5, in determining that plaintiff did not have and would not develop the abilities required of an officer, state law commanded him to apply that regulation. Connecticut General Statutes § 27–49 declares that appointments to the Connecticut National Guard, while made by the Governor, are to conform to federal standards.[4] Thus, his decision was made "under color of (a) statute . . . of (a) State" within the meaning of § 1983.

 The view that civil rights suits against National Guard officials may be brought under § 1983 is supported by the recent decision in Morgan v. Rhodes, 456 F.2d 608 (6th Cir.), cert. granted sub nom. Gilligan-v. Morgan, 409 U.S. 947, 93 S.Ct. 287, 34 L.Ed.2d 217 (1972). In *Morgan*, plaintiffs argued that their right to due process was violated by training programs of the Ohio National Guard which allegedly made inevitable the unnecessary use of deadly force. Their claim of jurisdiction under § 1983 was not controverted. One of the questions on which certiorari was granted was whether the court of appeals' decision, which reversed a summary dismissal of the complaint and directed a hearing, "violate(d) long standing policy against interference by federal courts with *state's* legitimate activities." 41 U.S.L.W. 3221 (emphasis added).

Since the plaintiff has sufficiently alleged a nonfrivolous federal claim that the defendants have deprived him of constitutional rights guaranteed to him under the first and fourteenth amendments to the Constitution, his complaint

---

3. See cases cited in Maryland v. United States, *supra*, 381 U.S. at 45 n. 5, 85 S.Ct. 1293. The Court held there that civilian employees of the Guard are also employees of the state. *Id*. at 46, 85 S.Ct. 1293.

4. Conn.Gen.Stats. § 27–49 provides in relevant part:
 "Officers of the national guard and naval militia shall be appointed by the governor, subject to the procedure prescribed in regulations of the department of defense relating to the national guard and naval militia."

cannot be dismissed for lack of jurisdiction. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); McClellan v. Shapiro, 315 F.Supp. 484, 487 (D.Conn.1970).

It is concluded that this court has jurisdiction of the present action under 28 U.S.C. § 1343(3) and the defendants' motion to dismiss on this ground is denied.

## II.

### Failure to State a Claim

Defendants' second contention is that, even if this court has jurisdiction, the decision taken by the defendants to exclude the plaintiff from OCS is not judicially reviewable.[5] Since no statute expressly precludes judicial review of National Guard actions,[6] the only justifiable reason for refusal to review would be that "the common law of reviewability," 4 Davis, Administrative Law Treatise §§ 28.04–07 (1958), commands it. Defendants so argue, relying principally on Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). But, despite the presence of expansive language in the opinion, a careful reading of Orloff does not support defendants' position.

Orloff presented the Supreme Court with a tangled web of issues. There were two statutory questions: must one specially inducted into the Army under the Doctors' Draft Act [7] (1) receive a commission and (2) be assigned to some medical task. The majority answered "no" to the first question, and held that one inducted under the Act must be assigned to "duties generally within a doctor's field." 345 U.S. at 87, 73 S.Ct. at 537. Having reached this result, the Court examined the facts sufficiently to determine that Orloff had been assigned to duties within that area. Id. at 92, 73 S.Ct. 534. This aspect of the opinion, if anything, cuts against the defendants' position, particularly because the Court implied strongly[8] that the claim of military discretion could not bar judicial review of a draftee's duty assignment which violated an applicable statute.

But beyond this, Orloff dealt with a question presenting constitutional overtones. The doctor was denied a commission when he refused to answer questions about Communist affiliations. The Court did, in fact, undertake to review this question and concluded that his refusal to answer constituted sufficient justification for the denial, despite the existence of a fifth amendment privilege. Professor Davis is surely right that this part of the Orloff opinion is "weak authority for unreviewability." Davis, supra, § 28.19.

After subjecting the Army's decision on these issues to review, the Court turned to Orloff's final contention. He argued that, since he was drafted as a doctor, he must be permit-

---

5. For a discussion of the distinction between jurisdiction and reviewability, which are frequently confused and commingled, see Bridges v. Davis, 443 F.2d 970, 973 (9th Cir. 1971).

6. Compare the Administrative Procedure Act, providing for judicial review of agency action ". . . except to the extent that—(1) statutes preclude judicial review." 5 U.S.C. § 701(a)(1).

7. This statute, formerly 50 U.S.C.A. App. § 454(i)(1)(A), provided that persons within "medical and allied specialist categories" could be drafted beyond the normal maximum age of induction.

8. The government had argued in the court of appeals that the Army could assign a person specially drafted under the Act to any job it saw fit. It reversed its position in the Supreme Court, which approved the concession:

"To separate particular professional groups from the generality of the citizenship and render them liable to military service only because of their expert callings and, after induction, to divert them from the class of work for which they were conscripted would raise questions not only of bad faith but of unlawful discrimination. We agree that the statute should be interpreted to obligate the Army to classify specially inducted professional personnel for duty within the categories which rendered them liable to induction." 345 U.S. at 88, 73 S.Ct. at 537.

ted to use all his medical skills or else was entitled to a discharge. He had not been permitted free rein of medical techniques; suspicious of his loyalty and fearful that he might stealthily obtain military secrets from patients whose minds he could control, the Army forbade him to use hypnosis or to administer certain drugs. Thus, this remaining question before the Court was exceedingly narrow: "Whether one lawfully inducted may . . . obtain a judicial review of his *assignments to duty*." 345 U.S. at 92, 73 S.Ct. at 539 (emphasis added). The oft-quoted pungent dicta about judicial deference to military decisions upon which the defendants here rely were uttered with respect to this narrow question only and should be read in the light of its origin. The precise holding of this part of *Orloff* retains its full force: decisions about "day to day operations of the armed forces," Lovallo v. Froehlke, 468 F.2d 340 (2d Cir., 1972), are beyond the scope of judicial review.[9] But *Orloff* should not be misread to forbid judicial scrutiny of constitutional or statutory violations on the theory that all military personnel decisions ipso facto possess a sort of immunity from review.[10]

Moreover, a growing body of case law recognizes that *Orloff* does not preclude review of military decisions allegedly violating constitutional or statutory rights. In Hammond v. Lenfest, 398 F. 2d 705 (2d Cir. 1968), the Navy claimed that denial of a claim of conscientious objection by one already in the service was not subject to judicial review. In this "water-shed opinion,"[11] Judge Kaufman rejected that contention. While emphasizing the general policy of judicial deference to military decisions, he held that the statutory right to conscientious objector status may be vindicated by resort to the courts.[12] He noted that other cases in the Supreme Court, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), and Harmon v. Brucker, 355 U.S. 579, 78 S. Ct. 433, 2 L.Ed.2d 503 (1958), subsequent to *Orloff*, had permitted review of military decisions affecting constitutional or statutory rights. Accord, Glazier v. Hackel, *supra*, 440 F.2d at 595–596.

Although it is clear that all military decisions are not beyond the reach of judicial review, it must still be decided whether this particular decision to oust Zitser from OCS may be reviewed. In upholding the denial of Orloff's commission, the Supreme Court offered another rationale which might command a court to hold its hand in the present case:

"It is obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander-in-Chief. Whatever control courts have exerted

---

9. Examples of this kind of decision are "orders, duty assignments, personnel status, and general administrative determinations." Note, Judicial Review of Military Discipline, 72 Col.L.Rev. 1048, 1056 (1972). In *Lovallo*, for example, the central question was whether an enlisted man had received his duty orders. See also, United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), affirming the district court which held that a decision about whether a claimant met the criteria for a hardship deferment based on "extreme community hardship" was "'peculiarly the kind of decision that must be made by the military.'" *Id.* at 373.

10. See Note, God, the Army and Judicial Review: The In-Service Conscientious

Objector, 56 Cal.L.Rev. 379, 425–429 (1968).

11. Glazier v. Hackel, 440 F.2d 592, 594 (9th Cir. 1971).

12. In distinguishing the duty assignment decision by the Army which the Supreme Court in *Orloff* declared unreviewable, Judge Kaufman stated:
"*Orloff* . . . does not mandate a contrary result for Orloff sought a discharge merely because he had been assigned duties as a medical laboratory technician rather than as an Army doctor; he did not claim that he was immune from induction or that he was entitled to a discharge if correctly assigned." 398 F.2d at 716 n. 15.

over tenure or compensation under an appointment, they have never assumed by any process to control the appointing power either in civilian or military positions." 345 U.S. at 90, 73 S. Ct. at 538.

The controlling principle expressed here is not simply that of unreviewability of military discretion, but unreviewability of executive discretion in making *all* appointments. If this principle still stands firm, defendants' motion ought to be granted.

A military decision with consequences to a West Point cadet similar to those in the present case was recently subjected to judicial review in Hagopian v. Knowlton, 470 F.2d 201 (2d Cir., 1972). Hagopian was expelled from West Point for exceeding the allotted number of demerits and alleged that his right to due process was violated since he did not receive a fair hearing before expulsion. While recognizing that *Orloff* commands that "the Academy's rigorous and exacting standards of discipline, behavior and personal decorum for cadets . . . should not be interfered with by the judiciary," 470 F.2d at 204, the court did not hold Hagopian's expulsion as a cadet unreviewable. Rather, it measured the proceedings leading to his expulsion against the commands of the due process clause and upheld the trial court's issuance of a preliminary injunction against separation without first affording Hagopian an appropriate fair hearing.[13]

■ In *Hagopian,* which this court is bound to follow insofar as it is pertinent to this case, Lewis v. Rockefeller, 431 F.2d 368, 371 (2d Cir. 1970); Thoms v. Smith, 334 F.Supp. 1203 (D.Conn.1971), the interest which was found to merit the protection of due process was the loss of the opportunity to continue in "a course of college instruction which he has pursued with a view to becoming a career officer," 470 F.2d at 209, coupled with its consequence of a "transfer to active duty 'in an appropriate enlisted grade' for not less than two nor more than four years." 470 F.2d at 204. The interest at stake in this case appears to be somewhat less important: the loss of opportunity to become an officer, the only consequence of which was to continue him in his status as a reservist. Nevertheless, the fact that he had accepted the Guard's offer to attend OCS and had entered into that program created an interest deserving of some measure of due process protection against his expulsion. Cf. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972)

■ More important than the alleged deprivation of Zitser's interest in the opportunity to become an officer is the alleged denial of his first amendment right to free speech by the defendants. Indeed, his principal claim is that the decision to expel him from OCS was made in retaliation for his exercise of the constitutional right of free speech. Mr. Justice Stewart's opinion for the Court in Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, 577 (1972), singled out the interest of speech as having special constitutional significance:

"For at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not act. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his con-

---

13. In an earlier case contesting ejection from West Point, the District of Columbia Court of Appeals also held the decision could be judicially scrutinized to assure Army compliance with its own procedural regulations governing expulsion. Dunmar v. Ailes, 348 F.2d 51 (D. C.Cir. 1965).

stitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460, 1473. Such interference with constitutional rights is impermissible."

Cortright v. Resor, 447 F.2d 245 (2d Cir. 1971), supports the result reached here. In that case, a member of an Army band claimed that his transfer from New York to Texas came in retaliation for his exercise of first amendment rights. Since he was given the same duty assignment (for which he had enlisted) at his new post, the precise Army decision in issue—his transfer—was even less injurious to his personnel classification than one which would have barred him from a previously granted opportunity to become an officer. Yet Chief Judge Friendly examined the facts of the case exhaustively, and his decision that plaintiff's first amendment rights were not sufficiently impaired to require the court to set aside the Army's otherwise legal order to transfer him to another post, 447 F.2d at 254, could hardly have been reached in an opinion denying review.

### III.

#### Conclusion

What the plaintiff has alleged is sufficient both to sustain the jurisdiction of this court and to withstand a motion to dismiss for failure to state a claim.

In holding reviewable Zitser's claim that he was ousted from Officer Candidate School as a result of opinions he expressed in the autobiography, this court does not reach the merits of that contention. In particular, no opinion is expressed about what rights he may possess in this situation, or whether they were violated. Resolution of those questions must await a hearing on the facts and arguments on the law.

For the foregoing reasons, the defendants' motion to dismiss must be and hereby is denied.

So ordered.