Dear General Fretterd:
You have requested our opinion on the legality of allowing soldiers of the Maryland Defense Force ("MDDF"), a unit of the organized Maryland militia, to volunteer "to undertake traffic and crowd control, civil disturbance, and similar law enforcement functions" as part of their military training. Specifically, you ask:
1. whether it is proper for MDDF soldiers to volunteer for these activities as military training without the Governor's approval or an appropriation of funds from the General Assembly;
2. whether MDDF soldiers would be covered by the Maryland Workers' Compensation and Tort Claims Acts when volunteering; and
3. whether MDDF volunteers subject themselves or others in the Executive Branch to civil rights liability under 42 U.S.C. § 1983.
Our opinion is as follows:
1. MDDF soldiers may not participate in unapproved training. Moreover, they may not engage in civilian law enforcement unless called into active duty by the Governor. As Commander-in-Chief of the militia, however, the Governor may determine the nature of the training regarded as appropriate for MDDF soldiers. In particular, the Governor has authority to determine that the concept of "training" extends so far as to allow MDDF soldiers to participate as volunteers, without pay, in traffic, parking, and crowd control activities, provided that these activities do not involve any law enforcement responsibility.
2. A MDDF soldier who is accidentally injured while performing his or her duties in an approved volunteer training program is eligible for compensation under the Workers' Compensation Act. Also, a volunteer who causes an accidental injury during such training would be covered by the Maryland Tort Claims Act. However, these laws do not apply to MDDF volunteers who participate on their own in unapproved training.
3. A MDDF volunteer who violates the civil rights of another "under color of state law" is liable under 42 U.S.C. § 1983. However, no liability falls on State officials unless they are personally involved or participate in the civil rights wrongdoing of subordinates.
 I Background
In the past, MDDF members have volunteered without pay to perform traffic, parking, and crowd control at both public and private events. The Adjutant General, the Governor's military representative, has ordered the MDDF to stop these voluntary activities.[1]
The MDDF has asked the Governor to overturn the Adjutant General's order and points out that MDDF volunteers have done this work for a number of years without incident and have received the praise of State and local officials. The MDDF argues that, as part of the State militia and with the Governor's approval, it could perform traffic, parking, and crowd control "training activities" as a volunteer service to local governments and community associations. Letter from Colonel Paul T. McHenry, Jr., MDDF Staff Judge Advocate, to Assistant Attorney General Craig Nielsen (June 21, 1996). Colonel McHenry states that the MDDF does not ask to act as police or to engage in law enforcement duties when training. Telephone conversation between Colonel McHenry and Assistant Attorney General Craig Nielsen (August 12, 1996).
The Adjutant General generally opposes the use of MDDF soldiers for these activities, citing liability concerns and the "long-standing American tradition against the use of uniformed soldiers to enforce civilian laws." Letter from James F. Fretterd, Adjutant General, to J. Joseph Curran, Jr., Attorney General (March 26, 1996).
Since the Militia Law, Article 65 of the Maryland Code, grants the Governor exclusive authority over MDDF training, we believe that a resolution to this dispute ultimately rests with the Governor and not with the Attorney General. However, to assist military authorities, we will analyze the legal authority of the Governor over militia training and the applicability of the various laws that have been mentioned in the course of the dispute.
 II The Governor and Militia Training
A. The Governor's Authority
The Maryland Constitution vests in the Governor authority as "Commander in Chief of the land and naval forces of the State." Article II, § 8. The Governor "may call out the militia to repel invasions, suppress insurrections, and enforce the execution of the Laws." Id.
The Constitution also vests in the General Assembly the duty to "make . . . such provision for organizing, equipping and disciplining the Militia, as the exigency may require, and pass such laws to promote Volunteer Militia organizations as may afford them effectual encouragement." Article IX, § 1. The General Assembly carried out this duty through enactment of the Militia Law, Article 65. The Militia Law would generally apply to the Governor's exercise of his authority over the militia.
Article 65, § 5 provides for the militia's organization by dividing it into two classes, the organized militia and the unorganized militia.[2] The organized militia consists of the Maryland National Guard ("MDNG"), the MDDF, and the reserve militia (Minute Men).[3] Subject to certain exceptions, the "unorganized" militia consists of "all able-bodied citizens of the State," whom the Governor may order into State service if troop strength in the organized militia is insufficient to deal with a crisis. See
Article 65, §§ 1, 2, and 8.
The MDNG has a dual status and may be called into either State or federal service.[4] When the MDNG is called into federal service, it is a part of the U.S. Army and loses its status as Maryland militia. See U.S. Constitution, Article 1, § 8, cl. 14 (providing congressional authority to call up "the militia to execute the Laws of the Union . . . ."). The MDNG is the "lineal descendant of the militia" as referenced in the Constitution.Zitser v. Walsh, 352 F. Supp. 438, 440 (1972).[5] However, Maryland retains the authority to train the MDNG subject to the control of federal requirements. See U.S. Constitution, Article 1, § 8, cl. 15 (State has authority to train the militia "according to the discipline prescribed by Congress"). The federal government provides funds and materiel for the support of the MDNG but provides no direct support for the MDDF.
As a separate part of the militia, the MDDF is within the Governor's exclusive control over training requirements:
 The Governor is hereby authorized to prescribe rules and regulations not inconsistent with the provisions of this subtitle governing the enlistment, organization, administration, equipment, maintenance, training and discipline of such [MDDF] forces; provided, however, such rules and regulations, insofar as he deems practicable and desirable, shall conform to existing law governing and pertaining to the National Guard and the rules and regulations promulgated thereunder . . . .
Article 65, § 63 (emphasis added).
In our view, the Governor has the option of approving a MDDF volunteer program as an element of "training." The Governor could reasonably conclude that traffic, parking, and crowd control experience, albeit gained in the pacific setting of a civic event, would better enable MDDF personnel to perform comparable tasks if called to active duty in an emergency. Even so indirect a link can fairly be thought encompassed by the broad term "training."[6] If the MDDF were called to duty to help evacuate an area in the face of an impending storm, for example, some experience in controlling large numbers of vehicles might serve the soldiers well — or so the Governor might reasonably conclude. Moreover, this exercise of the Governor's authority would not be inconsistent with the general training requirements of the Militia Law. See Article 65, § 27 (requiring each militia unit to train "not less than forty-eight times each year" and unless excused by the Governor, to participate in encampments).
Of course, the Governor need not exercise his discretion in this way. The Governor has the authority to follow MDNG training regulations if he considers them "practicable and desirable." He could deny the MDDF training request, because applicable regulations governing MDNG military training do not allow any volunteer program involving traffic and crowd control at either public or private events. Telephone conversation with Major Richard Parker, MDNG Staff Judge Advocate (August 9, 1996). See32 U.S.C. § 502(f) (allowing National Guard troops to train voluntarily without pay "[u]nder regulations to be prescribed by the Secretary of the Army. . ."). See also 32 C.F.R. Part 102 (National Guard Uniform Reserve Training Regulations do not provide for volunteer training in traffic or crowd control).
B. Militia and Law Enforcement
As a reason for denying the MDDF's training request, you cite the "long-standing American tradition against the use of uniformed soldiers to enforce civilian laws." Letter from General James F. Fretterd, Adjutant General, to J. Joseph Curran, Jr., Attorney General at 1 (March 26, 1996). However, as a legal matter, the federal Posse Comitatus Act, which embodies the rule against the use of soldiers to enforce civilian law, applies to certain U.S. troops only. See 18 U.S.C. § 1383 (Posse Comitatus Act does not apply to state militia but generally prohibits the use of the U.S. Army and U.S. Air Force to enforce civilian laws).[7]
The MDDF, as well as other units of the militia, may serve as civilian police when called to active duty by the Governor pursuant to Article 65. In a prior MDDF mission statement, Maryland military authorities indicated that MDDF troops work "with civil authorities and the Maryland National Guard in the preservation of life, protection of property and maintenance of law and order." Maryland National Guard, Annual Report for Fiscal Year 1991 at 30. This statement is consistent with the historical role of the militia when called by the Governor to support State or local law enforcement authorities in maintaining law and order: in 1877, in response to a railroad strike in Baltimore; in 1933, in response to mob violence and for service of arrest warrants in Salisbury; and in 1963, 1967, and 1968, in response to riots. See Robert J. Brugger, Maryland: A Middle Temperament 1634-1980, at 342, 508, 619 and 626 (1988).
The police powers of the MDDF are provided for in the Militia Law. Article 65, § 2 states that the Governor may call the MDDF, the MDNG, or any other part of the militia into service for a law enforcement purpose and may order "all or any part of the militia as he may deem proper or necessary" into active State service "in times of public crisis, disaster, rioting, catastrophe, insurrection, invasion, tumult, breach of peace or upon reasonable apprehension of the imminence thereof, or to enforce the laws ofthis State . . . ." (Emphasis added.)[8] Article 65, § 8 grants all active duty militia soldiers the status of police officers, "with all the authority of peace or police officers . . . ." When ordered into active duty for State service, militia troops have civil and criminal immunity for acts done in carrying out lawful orders. Article 65, § 52. See 59 Opinions of the Attorney General
517 (1974) (for immunity to attach, soldiers must act reasonably).
C. Conclusion
Based on the above authorities, we believe that the Governor has the option of adopting a voluntary program involving MDDF training in traffic and crowd control activities, to prepare MDDF soldiers should they be called to active duty and be required to perform comparable activities. Although Article 65, § 32 requires militia to be paid during training exercises, we do not believe that this provision precludes the Governor from establishing a program under which MDDF soldiers volunteer to train without pay.See Cubbage v. State, 304 Md. 237, 241, 498 A.2d 632 (1985) (a statutory right may be waived). However, MDDF soldiers do not have any police powers when training; they may act in a law enforcement capacity only when called to active duty by the Governor pursuant to Article 65, § 8.
 III
Workers' Compensation, Tort Claims, and Civil Rights Liability
A Workers' Compensation
The Workers' Compensation Act entitles MDDF officers and enlisted personnel to compensation if accidentally injured when training. Merrill v. Military Department, 152 Md. 474, 475,136 A. 897 (1927) (militia soldier covered when injured during training). The Workers' Compensation Act describes this coverage as follows:
 (a) Each officer or enlisted member of the organized militia of the State is a covered employee in peace time, while the member is:
 (1) training as part of the Maryland State Guard [now the MDDF]; or
 (2) on active military duty in the organized militia under order of the Governor in time of:
(i) civil disorder;
(ii) labor disorder;
(iii) natural disaster; or
 (iv) other events that require the support of the State Militia.
 (b) For the purposes of this title, the State is the employer of an individual who is a covered employee under this section.
§ 9-215 of the Labor and Employment Article, Maryland Code. Seealso Article 65, § 16 (requiring the Adjutant General "to maintain worker's compensation insurance for members of the Maryland [Defense Force])"; 26 Opinions of the Attorney General 263 (1941) (workers' compensation coverage for militia).
Therefore, if the Governor deemed the activities in question to be approved "training," the MDDF members involved in the activities would be covered by the Workers' Compensation Act.
B. Tort Claims
Under § 12-105 of the State Government ("SG") Article, Maryland Code, "State personnel" enjoy immunity from personal liability for their torts. The scope of the immunity is described in § 5-399.2(b) of the Courts and Judicial Proceedings Article:
 State personnel are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver.
Tort Claims Act immunity extends to some volunteers. Under SG § 12-101(3), the definition of "State personnel" — and, hence, Tort Claims Act immunity — includes an unpaid person who "is providing a service to or for the State" and who satisfies the State Treasurer's regulatory requirements. The Treasurer's regulation, in turn, defines a "volunteer" as someone who is "performing services to or for a unit of State government . . . .," who commits the alleged tort during the actual performance of those services, and who is either "participating in a formal volunteer program" or "is formally recognized . . . as a volunteer" before performing the services. COMAR 25.02.01.02(8).
In our view, a MDDF soldier performing voluntary traffic, parking, or crowd control duties as part of a training program authorized by the Governor can reasonably be said to be "providing a service to or for the State," in the terms of the statute, and "performing services to or for a unit of State government," in the terms of the regulation. To be sure, the immediate beneficiaries of the service are the organization sponsoring the event and members of the public who are in attendance. But, by hypothesis, the MDDF soldiers are performing these services only if the Governor had previously determined that these activities are a form of "training" that the MDDF soldiers should have experienced prior to a potential call to active service.
Thus, MDDF soldiers who participate in approved training of this kind would be covered by the Tort Claims Act. Without gubernatorial approval, however, MDDF activities of this kind would be outside the coverage of the Tort Claims Act.
C. Civil Rights Liability
Under 42 U.S.C. § 1983, a MDDF soldier will be held liable when the facts indicate that he or she has deprived another of a federal right "under color of state law". See Monroe v. Pape,365 U.S. 167 (1960) (damages are a permissible remedy for a violation of a federal right);Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974) (for purposes of liability under 42 U.S.C. § 1983, whether conduct is under color of state law depends on "whether there is a sufficiently close nexus between the state and the challenged action"). Thus, a court may find no liability under 42 U.S.C. § 1983
for a MDDF soldier who violates the civil rights of another while engaged in unapproved training if the facts of the case show no "nexus between the State and the challenged action." Id. Seealso, e.g., Knutson v. Wisconsin Air Nat'l Guard, 995 F.2d 765,767 (7th Cir. 1993) ("A section 1983 suit presumes some form of state action.").
Gubernatorial approval of the training would satisfy the "nexus" requirement. The risk of individual liability would remain low, however, because the approved training would not
involve the exercise of law enforcement powers, a source of many § 1983 claims. See Part II B and C above.
Moreover, even if a MDDF soldier were found liable under42 U.S.C. § 1983, this finding would not mean that superiors also are liable; depending on the factual circumstances, they may be immune from suit. The Eleventh Amendment to the U.S. Constitution bars suits against a state and superior officials who are sued in their official capacity. See, e.g., Scheuer v. Rhodes, 416 U.S. 232,238 (1974). In addition, an official may have a qualified immunity, depending on the scope of discretionary powers and "depending on all the circumstances that may be revealed by evidence." 416 U.S. at 240.
No immunity exists under 42 U.S.C. § 1983 when a claim of personal liability is brought against a state official individually for conduct that deprives another of a federal right under color of state law. 416 U.S. at 238. However, a court will not impose personal liability on a state official pursuant to42 U.S.C. § 1983 for the civil rights violations of subordinates unless the evidence shows personal involvement or participation by that state official in the subordinate's wrongdoing. Collins v.Harker Heights, 503 U.S. 115, 122 (1992) (government employer not liable for civil rights violations of employees unless the employer itself is involved in wrongdoing). See also Williams v.Smith, 781 F.2d 319, 323 (2d Cir. 1986) (involvement in civil rights wrongdoing includes (i) direct personal involvement; (ii) failure to remedy a wrong after notice; (iii) creating a policy, or allowing a policy to continue, that promotes civil rights violations; and (iv) gross negligence in managing subordinates who cause civil rights violations).
Therefore, depending on their involvement and the facts, superior State officials may or may not be held liable for the acts of subordinate MDDF soldiers under 42 U.S.C. § 1983.
 IV Conclusion
In summary, it is our opinion that, as part of the organized militia, MDDF soldiers are subject to the control of State military authorities and ultimately the Governor as Commander-in-Chief. The Governor has the authority to approve volunteer training activities for MDDF soldiers that would include traffic and crowd control; however, MDDF soldiers do not have law enforcement authority unless called to active duty by the Governor. Ordinarily, MDDF soldiers while training under orders are protected by the Workers' Compensation and Tort Claims Acts. Finally, the liability of a State official for the civil rights violations of a MDDF soldier under 42 U.S.C. § 1983 is not automatic but will depend on the facts of each case and the extent of that State official's involvement in the conduct of the MDDF soldier who violates another's civil rights.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Craig A. Nielsen Assistant Attorney General
_________________________ Jack Schwartz Chief Counsel Opinions Advice
[1] The Adjutant General commands the militia on a daily basis and acts on the Governor's behalf. See Article 65, § 10 of the Maryland Code (the Adjutant General is "in control of the Military Department of the State, and subordinate only to the Governor . . . ." Article IX, § 2 of the Maryland Constitution sets out the duties of the Adjutant General.
[2] The term "militia" includes all State military forces and has nothing to do with privately formed groups. See
Article 65, § 35 (prohibiting individuals from associating themselves as a military company or organization without the Governor's approval). Since the colonial period, the Governor has controlled the militia and appointed officers to train militia troops. S. Eugene Clements and F. Edward Wright, The Maryland Militia in theRevolutionary War 1 (1987).
[3] The MDDF was formerly called The State Guard. See
Chapter 239 of the Laws of Maryland 1990. Currently the reserve militia, or Minute Men, has no members and is inactive.
[4] The character of the National Guard, as it pertains to the exercise of federal and State authority, is explored inPerpich v. Department of Defense, 496 U.S. 334 (1990).
[5] A brief history of the militia may be found in Frederick Bernays Wiener, The Militia Clause of the Constitution, 54 Harv. L.Rev. 181 (1940).
[6] One court, quoting a dictionary, deemed "training" to mean "drill or discipline by which powers of the mind or body are developed; education." Severson v. Sueppel, 152 N.W.2d 281, 284
(Iowa 1967).
[7] We need not consider whether the traffic and crowd control activities in question would be encompassed by the Posse Comitatus Act, even if that law were applicable. See generallyUnited States v. McArthur, 419 F. Supp. 186 (D.N.D.), aff'd541 F.2d 1275 (8th Cir. 1976), cert. denied, 430 U.S. 970 (1977).
[8] Thus, the Governor is authorized to call the MDDF before calling the MDNG. Until Chapter 327 of the Laws of Maryland 1983, the Governor could not organize, maintain, or presumably train the MDDF until after the MDNG was called. Former Adjutant General Warren B. Hodges testified before the General Assembly that the Governor needed the authority to organize and to maintain the MDDF to deal with State emergencies before the MDNG was called into service. Testimony of Major General Warren B. Hodges before the Senate Constitutional and Public Law Committee on House Bill 21 (1983).
 *Page 133