Katherine **PHELPS, et al., Plaintiffs,**

v.

**WASHBURN UNIVERSITY OF TOPEKA, et al., Defendants.**

**Timothy PHELPS, Plaintiff,**

v.

**WASHBURN UNIVERSITY OF TOPE-KA; John Green; Carl Monk; Bill Rich; and Carol Vogel, Defendants.**

**Civ. A. No. 83–4198, 83–4259.**

United States District Court, D. Kansas.

Feb. 10, 1986.

---

Fred W. Phelps, Sr., Phelps-Chtd., Fred W. Phelps, Jr., Topeka, Kan., for plaintiffs.

Richard H. Seaton, Joseph A. Knopp, Everett, Seaton, Knopp & Thompson, Manhattan, Kan., Arthur E. Palmer, Marla J. Luckert, Goodell, Stratton, Edmonds, Palmer & Wright, Topeka, Kan., for defendants.

## OPINION AND ORDER

THEIS, District Judge.

This matter is presently before the Court on defendants' motion for summary judgment. In Case No. 83–4198, Katherine R. Phelps, Rebekah A. Phelps and Timothy B. Phelps allege they were denied admission to the Washburn University School of Law, in violation of 42 U.S.C. §§ 1981, 1983, 1985 and 2000d, and the first and fourteenth amendments. Specifically, the Phelps claim that the defendants discriminated against them in retaliation for plaintiffs' association with the cause of blacks, plaintiffs' association with the law firm of Phelps-Chartered and plaintiffs' association with their father, Fred W. Phelps, Sr. In Case No. 83–4259, Timothy Phelps alleges the same statutory and constitutional violations. He contends that he was retaliated against for filing the previous suit by not being admitted to Washburn Law School's Fall 1983 class from the waiting list.

The Court is familiar with the standards governing consideration of a motion for

summary judgment. Summary judgment may be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must look at the record in the light most favorable to the non-moving party. *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981); *Prochaska v. Marcoux*, 632 F.2d 848, 850 (10th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). Furthermore, before summary judgment may be granted, the moving party must establish its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). Summary judgment should not be granted if circumstantial evidence or factual inferences tend to establish genuine issues for trial. *Barber v. General Electric Co.*, 648 F.2d 1272, 1278 (10th Cir.1981). While summary judgment should be granted with particular caution in discrimination cases where questions of intent are involved, *Raby v. General Electric Co.*, No. 81–1632 (D.Kan., *unpublished*, October 5, 1984), a party resisting a motion for summary judgment must do more than advance conclusory allegations; it must set forth specific facts showing that there is a genuine issue for trial. *Dart Industries, Inc. v. Plunkett Co.*, 704 F.2d 496, 498 (10th Cir.1983).

In response to defendants' well-documented motion, the plaintiffs have submitted affidavits and exhibits attesting to "facts" which consist primarily of hearsay and conclusory allegations. In their voluminous submission, the plaintiffs have not controverted the following *material* facts.

The plaintiffs, Katherine, Rebekah and Timothy Phelps, are the natural children of Fred W. Phelps, Sr. The plaintiffs are white. All of the plaintiffs have worked for the law firm of Phelps-Chartered. Fred W. Phelps, Sr., and several of his children, Fred W. Phelps, Jr., Margie Phelps, Shirley Phelps-Roper, Jonathan B. Phelps, and Elizabeth Phelps, were admitted to, attended and were graduated from Washburn University School of Law. Timothy Phelps was admitted to and is now attending Washburn University School of Law. The individual defendants hold the following positions at the university and law school: John Green is the President of Washburn University; Carl Monk is the Dean of the Washburn University School of Law; Bill Rich is the Associate Dean of the law school and is Chairperson of the Admissions Committee of the Washburn School of Law; Carol Vogel is the Affirmative Action Director for the university.

The Washburn Law School's admissions process for 1983 operated as follows. Applicants for the Fall 1983 class were required to submit an application form, letters of reference and a report from the Law School Data Assembly Service (LSDAS). The LSDAS report contained the applicant's score on the Law School Admissions Test (LSAT) and the applicant's undergraduate grade point average (UGPA), as calculated by the LSDAS from the student's college transcript according to a standardized method.

The authority to make decisions concerning admissions to the law school was delegated by the dean to the associate dean and the admissions committee. The dean exercised no veto power over the decisions of the committee. The admissions committee was composed of five faculty members selected by the dean of the law school and two students, who were selected by the President of the Student Bar Association. Associate Dean Rich, one of the five faculty members, chaired the committee.

Before considering any applications for the 1983 class, the admissions committee determined two initial cutoffs, which established three categories of admissions files. The UGPA and LSAT scores demarcated these initial cutoffs. The first category was comprised of applicants whose UGPA and LSAT scores were sufficiently high to qualify them for automatic admission, subject only to a review to determine that their applications were complete and that they had satisfied all legal prerequisites for admission to the law school. The second class of applicants consisted of those whose

UGPA and LSAT scores were so low that the applicants would not ordinarily have been admitted. Nevertheless the associate dean reviewed these files to determine whether any factors other than the UGPA and LSAT indicated that the applicant should be considered further. The third category included applicants whose UGPA and LSAT scores fell between the cutoffs for the high and low groups.

Approximately forty percent of the files were placed in the first group of high UGPA and LSAT scores. Fifteen to twenty percent of the applications fell into the low category. The remaining approximately forty percent of the files were included in the third or middle category.

The applications falling into the middle category were reviewed by the admissions committee. The chairperson reviewed all of the files. The six remaining committee members were split into two groups, each with two faculty members and one student member. One group read all of the files of applicants whose last names began the letters A through K. The second group read the files of applicants whose last names began with the letters L through Z. Each committee member rated each file he or she read on a scale of 1 (low) to 5 (high).

After a file was read by the associate dean and half of the committee, it had a total of four ratings, which were added to produce a total committee score. Cutoffs were then established based on these committee scores. Applicants who received a rating above the cutoff were admitted. Applicants whose total committee scores were at or just below the cutoff were then reviewed by the other half of the committee. Thus, these applications were evaluated by all of the committee members.

Applications of applicants whose LSAT and UGPA scores placed them in the low group could have been moved up to the middle group and considered by the committee if the associate dean's review of the file identified some factor, such as minority status, warranting further consideration. The files of all minority applicants received a review by the entire committee.

When the committee members reviewed the files in the middle group, they could again consider the applicant's LSAT score and UGPA. In addition, committee members could have considered additional factors, including: graduate study; work experience; the personal autobiographical statement supplied by the applicant; the applicant's writing sample; minority status; leadership and community service experience; the applicant's undergraduate major or field of study (including grade inflation and difficulty of that field); the applicant's age or maturity; the applicant's sex; and the applicant's letters of reference. The admissions committee gave affirmative weight to minority status in rating applications.

Each committee member was given discretion in how to weight various factors and in how to score files. Some committee members took into consideration the fact that GPAs in some departments at Washburn are inflated. The defendants contend that there was no discussion among the committee members about any particular file prior to the time it was scored. While the plaintiffs assert that their files were discussed by the committee prior to scoring, the only evidence to which they point merely establishes that members of the committee had discussed the Phelps family at various times. No evidence is presented that Katherine, Rebekah or Timothy Phelps specifically were discussed. Furthermore, the plaintiffs present no evidence that their applications were ever discussed. In short, the record contains no evidence that the committee members did not evaluate the applications independently and without committee discussion.

In Rich's opinion, the experience of the law school has been that the LSAT score is one of the better indicators of whether a student will be able to perform at a minimally satisfactory level. Because of the correlation between low LSATs and law school failure and the lack of correlation between low GPAs and law school failure, individuals with high LSATs were likely to be admitted to law school regardless of

their GPA and those with very low LSAT scores were unlikely to be admitted.

Washburn University sought a class size of 185 to 190 for the Fall 1983 entering class at Washburn Law School. The number of students admitted was based on the determination to maintain a low student-faculty ratio and small sections.

Bill Rich, chairperson of the 1983 admissions committee, attended Oberlin College. He testified that he chose that institution in part because it was the first college to adopt a policy of nondiscrimination against blacks and other minorities. After graduating from law school, Rich worked for the Legal Aid Society of Wichita, Kansas. A major portion of his practice consisted of representing black clients. Since Rich came to Washburn University, he has worked with the plaintiffs in the reopening of *Brown v. Board of Education*, represented some black medical students who were sued for libel after they called one of their professors a racist, and done other consulting and appellate work, all on a pro bono basis.

Ronald C. Griffin was another faculty member on the admissions committee. Griffin is black. Griffin is a graduate of Howard University, a predominately black school. Griffin has participated in programs designed to aid minority law students, such as the Council on Legal Educational Opportunities (CLEO) program, has served on the Equal Opportunity Committee of the American Bar Association, was involved in the ABA's decision to participate as *amicus curaie* in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), has been a consultant to black plaintiffs in civil rights litigation, has served as a grievance examiner for the Equal Employment Opportunity Commission, and has assisted with the reopening of *Brown v. Topeka Board of Education*. Griffin wrote a letter in support of Fred W. Phelps' reinstatement to the federal bar.

Allen Easley was also a faculty member on the Fall 1983 admissions committee. Easley is half Caucasian and half Japanese.

Easley has participated as an instructor in the CLEO program, which attempts to recruit minorities to law schools. Easley had often visited with Marge Phelps about various discrimination actions. The plaintiffs have characterized these conversations as mutually beneficial. Easley has participated, on a pro bono basis, as an advisor to plaintiff's counsel in *Brown v. Topeka Board of Education*. Furthermore, Easley wrote a letter on behalf of Fred W. Phelps, Sr., in connection with his suspension proceeding in federal court.

Charlene Smith was another faculty member on the admissions committee. Smith testified that she chose to serve on the admissions committee to encourage Washburn to have an active affirmative action program. Before coming to Washburn Law School, Smith worked for the Minnesota Attorney General prosecuting cases based upon discrimination.

The fifth faculty member on the admissions committee in 1983 was James Ahrens. Ahrens served on the admissions committee when several of the other Phelps children were admitted to the law school.

One of the student members on the admissions committee which considered applications for the Fall 1983 entering class was Bea Adams. Adams is black. The second student member of the 1983 admissions committee was Steven Good. Good testified that he considered himself on a friendly basis with one of the plaintiff's brothers, Jonathan Phelps.

Dean Carl Monk did not participate in the admissions process in any way. Monk became involved in this case only through the appeals process which plaintiffs utilized. Monk attended law school at Howard University, which at that time had an enrollment consisting of eighty to eighty-five percent blacks. Monk testified that part of his motivation for attending Howard was his interest in the civil rights movement. While in private practice, Monk acted in a pro bono capacity representing plaintiffs in a voting rights case in the State of Mississippi.

Katherine Phelps submitted an application for admission to the Fall 1983 class, which application was dated February 16, 1983. The law school received a report from LSDAS which indicated Katherine's undergraduate grade point average was 2.16 for 147 semester hours. Katherine Phelps contends that her UGPA was 2.69, as computed by Washburn University. The LSDAS average is different from the Washburn average because of the computation system used by LSDAS. In Katherine Phelps' case, LSDAS considered any Fs regardless of whether the class was repeated, while Washburn only included the grade received when the class was repeated.

Katherine Phelps had taken the LSAT several times. Her highest score was a 28 on a scale of 50, which gave her an LSAT percentile rank of 38. Her previous scores were a 412 on a scale of 800 (LSAT percentile rank of 12) and 24 on a scale of 50 (LSAT percentile rank of 22).

Rebekah Phelps submitted an application for admission to the Fall 1983 class. Her application was dated February 28, 1983. Rebekah Phelps' GPA as reported by LSDAS was 3.19 for 108 semester hours. Rebekah Phelps had taken the LSAT three times. Her highest score was a 22 on a scale of 50, placing her in the fifteenth percentile of those who took the LSAT. Her previous scores were a 378 on a scale of 800 (LSAT percentile rank of 7) and 21 on a scale of 50 (LSAT percentile rank of 7).

Timothy Phelps submitted an application for admission to the Fall 1983 class. His application was dated February 28, 1983. Timothy Phelps' UGPA was a 3.37 based on 87 semester hours. He had an LSAT score of 26 on a scale of 50. LSDAS reported Timothy Phelps' LSAT percentile rank as 30. Timothy Phelps' undergraduate major was Criminal Justice. Generally, the grades of students in the Criminal Justice Department at Washburn average almost .5 higher than the average Washburn GPA.

In December of 1982 and January of 1983 the law school admissions committee met and decided how it would handle the files and determined the breakoffs between the three categories of files. Approximately 650 applications were received. Approximately 250 files fell in the middle category. The other files fell into the categories of high scores and low scores. Timothy Phelps' file fell within the middle category. Rebekah Phelps' and Katherine Phelps' scores placed them in the lowest category. However, the associate dean, Bill Rich, moved their files into the middle category. Upon a review of Katherine Phelps' file, Rich decided to place her in the middle category because he felt that her age and other factors warranted a committee review. Also, he noticed that Katherine Phelps' GPA had fluctuated a great deal from semester to semester which made the average deceptive. Because of Rebekah Phelps' work experience, letters of reference and motivation toward the practice of law, her file was placed in the middle category for review by the committee.

Beginning in February of 1983, the committee began accepting applicants in the middle group if their total score by those who had reviewed their file exceeded 16 out of a possible 20. Because the three plaintiffs did not apply until late February and since the admissions committee had to wait until it received the LSDAS reports, the plaintiffs' applications were not reviewed until early April.

On March 21, 1983, Charlene Smith, one of the members of the admissions committee, received a deposition subpoena from the law firm of Phelps-Chartered issued in a case unrelated to the present suits. Smith called the Phelps law office and spoke with Shirley Phelps-Roper. Phelps-Roper informed Smith that the firm intended to depose her concerning possible efforts by Smith to have Fred W. Phelps, Sr., disbarred in federal court. Smith felt that Phelps-Roper was quite hostile during this conversation. Because of this incident, Smith decided she should recuse herself from the consideration of the plaintiffs' applications. In her deposition, Smith ex-

plained that she felt it was necessary to withdraw to avoid the appearance of bias. Smith's recusal occurred prior to the consideration of any of the plaintiffs' files.

The plaintiffs assert that Smith's act of recusal prejudiced the other members of the committee. The plaintiffs' authority for this belief is Myra Hinman, a client of the Phelps firm, who, according to the defendants, has no personal knowledge about the admissions process at Washburn Law School.

One of the plaintiffs' sisters, Marge Phelps, complained to Dean Rich about the involvement of Bea Adams in the review process. At one time Adams had been an employee of Phelps-Chartered and Marge Phelps apparently believed Adams might have some bad feelings against the Phelps. Based on that conversation, Rich, in assigning files, assigned Adams to review the files of applicants whose names began with A through K so that Adams would not be involved in a review of the Phelps' files. However, as will be explained later, since Timothy Phelps' file was reviewed by the entire committee, Adams did review his file.

The admissions committee continued to lower the committee score cutoff in order to achieve the desired class size. By April 1, 1983, the committee score which served as the cutoff was 14.

Katherine Phelps received the following scores:

| | |
|---|---|
| Good | 2 |
| Griffin | 4 |
| Rich | 2 + |
| Ahrens | 3 |

Katherine Phelps' total committee score was 11. Since her score fell below the cutoff of 14, Katherine Phelps was not accepted. She was sent a rejection letter dated May 3, 1983.

Rebekah Phelps received the following committee scores:

| | |
|---|---|
| Good | 3 |
| Griffin | 3 |
| Rich | 2 + |
| Ahrens | 2 |

Rebekah Phelps' total committee score was 10. She was not admitted to the law school and was sent a rejection letter dated May 3, 1983.

Timothy Phelps' total score was 13, which was one point below the cutoff of 14. He received the following committee scores:

| | |
|---|---|
| Good | 3 |
| Griffin | 3 |
| Rich | 4- |
| Ahrens | 3 |

The admissions committee determined that all of the applicants' files which had been scored 13 should be reviewed by the other half of the committee since these people were borderline. Some would be admitted and others would not. After a review by the entire committee, an applicant could have a total score of 35. The committee decided that those with a score of 24 or above should be admitted and those with a 23 would be placed on the waiting list along with some who had scored a 22. Since Timothy Phelps had scored a 13, he was reviewed by the other half of the committee.

Before Timothy Phelps' file was given to Bea Adams, Rich discussed with her the concerns expressed by Marge Phelps. Adams told Rich that she had no feelings of animosity toward Timothy Phelps and that she regarded him as a friend. When Timothy Phelps' file was reviewed by the other committee members, he received the following scores:

| | |
|---|---|
| Easley | 3 + |
| Adams | 4 |

Because the seventh member of the admissions committee, Charlene Smith, did not review Timothy Phelps' file, he was credited with a seventh score of 3 additional points, which was the average score he received from the other members of the committee. Timothy Phelps received an overall score of 23, which placed him on the waiting list. On May 2, 1983, Timothy

Phelps was informed by letter that he had been placed on the waiting list.

Once the waiting list was composed, the committee ranked the top fifteen of the thirty-two applicants on the list. Allen Easley testified that in rating Timothy Phelps' standing on the waiting list, he might have ranked Timothy Phelps higher than he might otherwise because of the claims of bias being made against some of the committee members.

In June of 1983 the law school sent out postcards to all of those who had paid their deposits to accept their admission. On the postcard the students were asked to indicate whether they were still planning to attend Washburn Law School. A second such mailing was sent out in late July of 1983. If the number of those who had indicated they would attend had dropped below 185, students would have been taken off the waiting list. Washburn does not increase the class size to take people off of the waiting list. For the Fall of 1983 no people were taken off of the waiting list. Two hundred people enrolled for law school on August 15, 1983.

For the Fall class of 1983, twenty-nine minorities were accepted. Nine of these were Black, eleven were Hispanic, six were American-Indian and three were Asian-Americans. A higher percentage of minority applicants than non-minority applicants were accepted. On the average, the LSAT and UGPA scores for minority students admitted to the Fall 1983 class were lower than those of whites. The median LSAT and GPAs for the class entering law school in the Fall of 1983 was higher than in previous years.

Based on the methodology of plaintiffs' statistician, 157 applicants with higher combined LSAT scores and GPAs than Katherine Phelps' were rejected. The defendants contend that only two applicants whose LSAT scores and GPAs were lower than Katherine Phelps' were admitted to the 1983 Fall class and that both of those applicants were black. The plaintiffs controvert this contention by pointing to the testimony of Dr. Michael Rubison, a statist-

ician who testified at the plaintiffs' grievance hearing. Rubison stated that there were four students with lower scores who were admitted. Rubison, however, used a UGPA for Katherine Phelps of 2.62. This UGPA, as computed by Washburn University, did not include any F grades for classes which Katherine Phelps repeated. The committee, in considering all applications, used the LSDAS score, which involved a standardized computation method that made UGPAs from all schools comparable. The LSDAS method included all Fs regardless of whether the class was repeated. Katherine Phelps' UGPA as reported by LSDAS was 2.16. The defendants point out that even using the higher GPA, the four students with scores lower than Katherine Phelps' who were admitted were all minorities.

Forty applicants were rejected who had higher combined scores than Rebekah Phelps. Eight students were rejected whose GPA and LSAT were both higher than Rebekah Phelps'. Only one white applicant was admitted who had a lower GPA and LSAT than Rebekah Phelps. That applicant had a Ph.D with a high post-graduate GPA, twenty years of work experience, extremely strong references, substantial publications and significant community experience. Three minorities were accepted who had both a lower LSAT score and a lower GPA than Rebekah Phelps.

Of applicants with undergraduate GPAs between 3.25 and 3.49 (Timothy Phelps' was 3.37) and LSAT scores between the percentiles of 21 and 30 (Timothy Phelps' was 30), five applicants were accepted and seven were rejected. Of the ten applicants with LSATs and GPAs most similar to Timothy Phelps', five were admitted and five were rejected. Eighty students who had higher LSAT scores than Timothy Phelps were not accepted. Seven students with higher GPAs than Timothy Phelps' were not admitted. During the pendency of the grievance procedure filed by the plaintiffs, a review was made of several files to determine how the committee's scoring of Timothy Phelps' file compared with the rating

of other applicants whose LSAT scores and GPAs were the same or higher than Timothy Phelps'. The review revealed several applicants with higher GPAs and LSAT scores who received equivalent or lower scores from each committee member.

By the plaintiffs' methodology, seventy-two students with solely a lower LSAT score than Katherine Phelps' were admitted. Seventy-five students with solely a lower GPA than Katherine Phelps' were admitted. Eight students with solely a lower LSAT than Rebekah Phelps' were admitted, and 253 students with solely a lower GPA than Rebekah Phelps' were admitted. Thirty-two students with solely a lower LSAT score than Timothy Phelps' were admitted, and 298 students with solely a lower GPA than Timothy Phelps' were admitted. The defendants point out that the acceptance method they employed for all applicants used a combined evaluation of LSAT score and GPA.

Under Washburn University's affirmative action policy, a law student or law school applicant who alleges discrimination may request a review of the alleged discriminatory act by the dean of the law school. Timothy and Rebekah Phelps requested such a review by sending a letter to the dean, Carl Monk. Monk requested that Bill Rich investigate the charges. Rich compiled a report regarding the admissions process and the applications of Rebekah and Timothy Phelps. The report reviewed the admissions procedure, the recusal of Charlene Smith, the discussion with Bea Adams and Adams' limited review of the files. The report noted that there were more than forty applicants rejected who had higher combined GPA and LSAT scores than Rebekah Phelps and that there were at least eight students rejected whose LSAT scores and GPA were both substantially higher than Rebekah Phelps'. The report concluded that Rebekah Phelps had received a full and appropriate review.

The same conclusion was reached with respect to Timothy Phelps. Timothy Phelps had a relatively low LSAT score. The report reviewed those who were admitted with scores slightly above or below Timothy Phelps'. Some applicants with similar scores who were not placed on the waiting list were described. For each of those who was accepted, there was some factor such as a high GPA, postgraduate degree or age which the committee considered favorably. The report noted that Timothy Phelps' lower than average performance for his first two years of college and his low LSAT score hindered him.

Monk then wrote a letter and sent a copy of Rich's report to Timothy and Rebekah Phelps. His letter stated that any claims of discrimination were groundless. The letters of Monk and Rich were copied to President John Green and Affirmative Action Director Carol Vogel.

Subsequent to the request by Timothy and Rebekah Phelps for a grievance review, Katherine Phelps also requested a review. Rich again investigated. In his report he noted that Katherine Phelps had both a low LSAT and a low GPA. Fewer than ten percent of admitted non-minorities had lower LSAT scores. Katherine Phelps' GPA was dramatically low. According to LSDAS, Katherine Phelps ranked in the bottom seven percent of Washburn students whose transcripts were analyzed. Only two students were admitted with an LSAT and GPA lower than Katherine Phelps'. Both were black. The letter explained that the only reason Katherine Phelps' file was given consideration was because of her background. The letter concluded that her previous legal experience was not sufficiently strong to outweigh her low LSAT score and GPA.

The plaintiffs all initiated the next step of the review process by appealing to the President. President Green requested that the affirmative action office, university internal legal counsel and Dean Monk investigate the charges of discrimination. They reported that they felt confident there was no discrimination. Vogel recommended that the next step of the grievance procedure be implemented and that a hearing be conducted. The President granted a hearing before a panel of three members. The

plaintiffs selected one panel member, the law school selected a panel member and those two selected the third member from a list supplied by Green. After conducting five days of hearings, the panel concluded that no race-based discrimination had occurred with respect to the plaintiffs' applications for admission to the law school. The plaintiffs chose not to appeal this decision to the Board of Regents.

Minorities, not including women, comprise five percent of the students who paid deposits for the classes of 1982 and 1983. In 1982 and 1983 minorities received thirty percent of the financial aid given by the law school to first year students. Washburn University states that it actively conducts recruitment of minorities. By affidavit, Jonathan Phelps, one of plaintiffs' brothers, testified that he observed no real interest in meaningful recruitment at the law school. Washburn University Law School hosts a summer program sponsored by the Council on Legal Educational Opportunities (CLEO). Washburn Law School follows an affirmative action plan in the admission of minorities.

The plaintiffs again applied for admission to the law school class of 1984. Only Timothy Phelps was accepted.

## I. STANDARDS

Defendants cite as a general proposition the principle that universities have a wide range of discretion in academic decisions. *See Regents of University of Michigan v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). Judicial intervention is usually not appropriate unless there is a challenge that the action of the educational institution was arbitrary, capricious or discriminatory. *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Gasper v. Bruton,* 513 F.2d 843 (10th Cir. 1975). In the present case, the plaintiffs make just such a challenge. Therefore, the Court must adopt a more active posture of review.

Plaintiffs' contention is that they were discriminatorily denied admission to the Washburn University School of Law in retaliation for their association with civil rights work, their association with the law firm of Phelps Chartered, and their association with Fred W. Phelps, Sr. The Tenth Circuit enunciated the standards by which courts should evaluate retaliation cases in *Burrus v. United Telephone Company of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir. 1982):

A plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) she was disadvantaged by an action of her employer subsequent to or contemporaneously with such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action.

The Court assumes that the above standards, although developed in an employment context, apply to claims of retaliatory discrimination in an academic admissions context. Dk. no. 41, p. 21. Furthermore, principles developed in Title VII cases are applicable to actions under 42 U.S.C. § 1981 as well. *Sabol v. Snyder,* 524 F.2d 1009 (10th Cir.1975).

With respect to plaintiffs' claims under the first amendment, the plaintiffs must establish that their activities were constitutionally protected and that those activities were a "substantial" or "motivating" factor in the defendants' decision not to admit them to law school. *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If the plaintiffs discharge this burden, the burden of proof then shifts to the defendants to show by a preponderance of the evidence that they would have made the same decision "even in the absence of the protected conduct." *Id.* Thus, under either the *Burrus* standard for retaliation cases under Title VII or § 1981 or the *Mount Healthy* standard for retaliation claims based on the first amendment, the plaintiffs must establish the denials of their admission to law school were causally

related to the plaintiffs' civil rights work or their exercise of their first amendment rights of association. Assuming *arguendo* that the Phelps were engaged in protected activities, the Court shall examine the causal nexus between the denials of admission and the plaintiffs' civil rights activities.

## II. DENIALS OF PLAINTIFFS' APPLICATIONS FOR ADMISSION

### A. OBJECTIVE DATA

The Washburn admissions committee employed an admissions procedure which divided all applicants into three categories based upon their objective (GPA and LSAT scores) qualifications. Since many individual qualities may not be reflected in these numerical indicators, the Washburn plan allowed for elevation of applications from the bottom group to the middle group based on individual factors. The Washburn plan is substantially similar to the Harvard College admissions process, which was approved by the Supreme Court in *Regents of the University of California v. Bakke*, 438 U.S. 265, 316, 98 S.Ct. 2733, 2761, 57 L.Ed.2d 750 (1978).

■ Plaintiffs have failed to controvert the objective evidence. Although the plaintiffs' statistician viewed the scores from a variety of perspectives (e.g., comparing the sole factor of plaintiffs' GPAs or the sole factor of plaintiffs' LSAT scores with the GPAs or LSATs of other applicants), when the objective evidence is viewed from the perspective that the Washburn admissions committee used for all applicants, it overwhelmingly demonstrates that the plaintiffs simply were not qualified for admission to the law school.

The statistical evidence established that Katherine Phelps was treated no differently by the admissions committee than other whites. No whites with equal or lower LSAT scores and GPAs than Katherine Phelps were accepted in the Fall 1983 class. Many applicants with better scores were rejected. Furthermore, Katherine Phelps' highest percentile ranking on the LSAT was 38, while her GPA was 2.16. The undisputed evidence indicates that Katherine Phelps was rejected because of her relative lack of qualifications.

Rebekah Phelps had a GPA of 3.19. However, her GPA was largely offset by her LSAT score, which gave her a percentile ranking of 15. Forty applicants with higher combined LSAT scores and GPAs than Rebekah Phelps were rejected. Eight applicants with both a higher LSAT and a higher GPA were rejected. Rebekah Phelps did have a higher LSAT score and GPA than one white applicant who was accepted. This applicant had a Ph.D with a high postgraduate GPA, qualifications which Rebekah Phelps did not possess. Furthermore, this applicant had twenty years of work experience, strong references, substantial publications and significant community experience. The objective evidence points solely to Rebekah Phelps' relative lack of qualifications.

Timothy Phelps' GPA was 3.37. However, his LSAT score had a percentile ranking of 30. The evidence establishes that Timothy Phelps was treated the same as similarly qualified applicants with a fairly high GPA but a low LSAT score. Timothy Phelps' low LSAT score placed him on the borderline of those students who were accepted. A comparison of the committee members' scoring of Timothy Phelps' application with those applications of persons with higher LSATs and GPAs indicates that Timothy Phelps' application was treated fairly. Furthermore, for a plaintiff to show he is *as* qualified as other applicants is not sufficient to raise any inference of discrimination. *See Olson v. Philco-Ford*, 531 F.2d 474 (10th Cir.1976).

At best, the Phelps were marginal applicants. Since the record of each applicant provides ample evidence of the student's scholastic insufficiencies and because the objective statistics belie any hint of discriminatory conduct, the Court is persuaded beyond a reasonable doubt that summary judgment is proper. *See Hines v. Rinker*, 667 F.2d 699, 703 (8th Cir.1981). Entirely apart from the objective evidence, other factors establish that the claimed injury—

the denials of admission—is not causally related to any retaliatory motives for protected activity. While Rebekah Phelps' and Katherine Phelps' scores placed them in the automatic rejection category, it was their very work experience with the Phelps-Chartered law firm that caused Bill Rich to move them into the middle group. Moreover, the admissions committee's emphasis on affirmative action and the committee's decision to accept two minority students with qualifications similar to Katherine Phelps' indicates that the committee had no anti-minority bias. Although the Court is convinced by the objective evidence that summary judgment is appropriate, because the Court does not grant summary judgment lightly, it will examine the specific circumstances that plaintiffs claim justify an inference of retaliatory motive.

### B. SUBJECTIVE INFERENCES

The plaintiffs have made specific accusations of bias with respect to each member of the committee. Viewing each incident in the light most favorable to the plaintiffs, the Court has carefully examined the circumstances of the transactions to see if the plaintiffs can draw any reasonable inferences that panel members have negative sentiments because of the Phelps participation in civil rights activities.

Plaintiffs cite the following testimony by Stephen Good, another member of the admissions committee, about Bea Adams:

Q. You said that Bea Adams has made comments about the Phelps family?

A. Yes.

Q. When was that?

A. Well, I really haven't known Bea except on this Admissions Committee.

Q. So it was during the time period that you both served on the committee?

. . . . .

A. Well, pretty much ever since the—what, May 4th, was it, that this thing started, something like that.

Q. How many conversations have you had with her?

A. Oh, I'd say after—three.

Q. Okay. What did she say in those conversations?

A. Well, she's not—doesn't like the Phelps.

Q. That's what she told you?

A. That's what I would infer.

Q. What kinds of things did she tell you?

A. Well, she thinks that you all are trying to prohibit her getting a job somehow in Wichita?

Dk. no. 40, pp. 17–18. Plaintiffs also refer to the deposition testimony of Adams herself in which she states that she was somewhat upset with the Phelps-Chartered firm after she stopped working for them. Finally, the Phelps quote the testimony of Steven Sublett, a student at Washburn:

But on one occasion I know [Bea Adams] was criticizing the Phelps firm and said that the Phelps mischaracterized the law and mischaracterized cases and also wanted her to do that, and something to the effect that the Phelps don't give a darn about black people, all they want to do is practice their own kind of law and they don't really care anything about their clients. And just generally I got the impression that she harbored quite a bit of resentment and animosity towards the whole organization.

*Id.* at 19.

The most that can be said about Adams' sentiments toward the Phelps is that she harbored some negative feelings toward them because of her previous employment with the Phelps-Chartered firm. Far from pointing to any retaliatory motives on Adams' part for the Phelps' involvement in civil rights, the clear import of the testimony is that Adams, a black, thought the Phelps did not truly believe in civil rights causes. Furthermore, the record is devoid of any evidence that whatever anti-Phelps sentiments Adams possessed influenced the non-admission of the Phelps. In fact, the only input Adams had was on the full committee review of Timothy Phelps' application. Adams gave Timothy Phelps' file a score equivalent to the highest score given to him by any other committee member.

The second member of the admissions committee about whom the Phelps complain is Stephen Good. Elizabeth Phelps, one of the plaintiffs' sisters, gave the following testimony:

Q. Did you find out later that Mr. Good had personal animosity toward Phelps?

A. Yes, I did.

Q. And do you know why, at least in part?

A. Well, from what I understand it's because his wife applied and we didn't hire her or something and—oh, just her family or something didn't like us selling candy when we were kids, some insipid nonsense like that.

*Id.* at 27. Thus, according to the Phelps, the reason that Good was prejudiced against them was not because of their civil rights activities, but because the firm of Phelps-Chartered had not hired his wife.

The next committee member about whom the plaintiffs complain was Charlene Smith. Smith recused from participation in the admissions process with respect to the Phelps' applications because she had been subpoenaed for a deposition by the Phelps-Chartered firm and because the firm apparently was alleging that Smith participated in a conspiracy to disbar Fred W. Phelps, Sr. The plaintiffs contend that Smith's very recusal infected the committee. By the Phelps' reasoning, Smith was damned if she did and damned if she did not recuse. Further, while all reasonable inferences must be indulged in favor of the plaintiffs, the key is *reasonable*. In the complete absence of facts supporting the plaintiffs' infection theory, the Court cannot accept speculation as fact.

The plaintiffs claim that Bill Rich, chairperson of the admissions committee, also exhibited an anti-civil rights attitude. Marge Phelps, one of the plaintiffs' sisters, testified as follows:

Q. What about Professor or Dean Rich?

A. All right. Dean Rich, first time I ever found out about him, because I think he started teaching after I started to school, somebody told me that he was going to be teaching things like civil liberties and whatnot. In fact I think Professor Griffin told me this.... And he specifically told me that he was going to be involved in the reopening of *Brown versus Board of Education*.... So I went to Professor Rich.

Q. Dean Rich here?

A. Yes, sir.... And I told him—you know, I was pretty enthusiastic about the whole thing. I figured here's a guy who's kind of like-minded and get something going here because the more help you can get, the better off you are. So I went to him and, you know, told him and all and very enthusiastically offered my services and discussed with him—actually it was me telling him at length about what I knew, so when I got done there could have been no doubt I had demonstrated some knowledge and expertise and interest in the matter. And I was quite offended and quite surprised by his response because his response was to shut me off. He didn't even want me to keep talking, and gave me some response like, "We'll see" or something like that. Never—I never heard from him after that about that matter.

*Id.* at 38–39. Marge Phelps also testified that Dean Rich failed to ask her father or brother to speak at a civil rights seminar that Rich hosted. Once again, the testimony is not susceptible of the inference that Rich exhibited any anti-civil rights animus. The only conclusion that can be drawn from the testimony is that Rich did not invite the Phelps to participate in civil rights activities *with him*.

The plaintiffs allege that James Ahrens, the fifth member of the admissions committee, had an "anti-Phelps" attitude. According to the plaintiffs, Ahrens took steps toward removing one of plaintiffs' sisters, Marge Phelps, from his class for excessive absenteeism. The Phelps claim that Ahrens had animosity toward Fred W. Phelps, Sr., because Ahrens believed Fred W. Phelps, Sr., has poor judgment, had stolen money, and had improperly wrote a paper

for a black student. If the Court accepts these accusations as true, all of the instances point to reasons other than the Phelps' civil rights work for Ahrens to have animosity against the Phelps. Furthermore, even if Ahrens had animosity, according to the plaintiffs' own rendition, he had negative sentiments toward the plaintiffs' sister and father, not toward them. Moreover, the plaintiffs have not offered a shred of evidence that any sentiments Ahrens had about the Phelps family influenced his ranking of the plaintiffs' academic capabilities.

The sixth member of the admissions committee was Ronald Griffin, a black professor. To establish bias on Griffin's part, the plaintiffs point to the testimony of Marge Phelps, one of the plaintiffs' sisters:

A. And I'll tell you—if you want me to honestly tell you what I think about Ron Griffin and whether he'd be fair to these applicants, especially in the context of what we're here about, I'll tell you that.

Q. Okay.

A. What I think is that he is a very idealistic but gentle man. That he is— his academic position is extremely important to him, that he is not a black role model, that he is not nearly as devoted to our cause as I am, that he would, I'm sorry to say I believe, succumb to pressure by his colleagues. I struggled with that question and that's why I'm hesitant in answering you. But I have to tell you that I think despite the fact that I have some very strong feelings for him, I believe that he, if push came to shove, wouldn't have the strength to do what was right here.

Q. Do you think that he unfairly evaluated the applications in this case?

A. I think that—I think he found himself in a situation where there was a lot of controversy surrounding these applications witnessed by things like Bea Adams being removed, witnessed by things like Charlene Smith removing herself, and I think that it would have been difficult for him to, despite that, have given it a completely fair and unbiased treatment of these files. That's what I think.

Id. at 47–48.

According to the plaintiffs' own rendition, the worst that can be said about Griffin, a black man, is that he was not as committed to civil rights as the plaintiffs' sister. This conclusion is no evidence that Griffin retaliated against the plaintiffs for their family's civil rights activities; in fact, it proves quite the opposite. The only other allegation of prejudice with respect to Griffin is that he might have been infected with whatever free-floating bias resulted from Charlene Smith's subpoena and recusal. A speculation of this sort is not the kind of competent evidence which can defeat a motion for summary judgment.

The last member of the admissions committee was Allen Easley, a half-Caucasian, half-Japanese professor. The charges against Easley are vaporous: that he became involved in Charlene Smith's recusal and that he contacted Marge Phelps by phone and said he did not agree with her handling of the Smith matter. The plaintiffs refer generally to Easley's deposition as support for these allegations. A fair reading of Easley's deposition is that he was close to Marge Phelps and that he attempted to intervene between his friend, Marge Phelps, and his colleague, Charlene Smith, to calm the waters. In any event, the plaintiffs do not even suggest that Easley harbored any animosity toward the Phelps for their civil rights activities.

■ In sum, the evidence is not susceptible to the attributions plaintiffs place upon it. Conclusory statements and unsubstantiated allegations cannot defeat a motion for summary judgment. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The "evidence" itself is rife with speculation, innuendo and hearsay. But even accepting the evidence and viewing it in the light most favorable to the plaintiffs, the most that has been proven is that Adams and Good might have had some

negative sentiments toward the Phelps-Chartered firm—not these particular plaintiffs—entirely apart from their civil rights activities. Indeed, the Court finds it remarkable that many of the quoted passages attest to the strong civil rights interests of the individual committee members. Furthermore, there is simply no evidence that any anti-Phelps sentiment affected the evaluated procedure. No inferences can be drawn from the evidence that the individual members of the committee denied the plaintiffs admission to law school because of their civil rights activities.

## III. INTERESTS AND PARTIES INVOLVED

Thus far the Court has assumed that the Phelps are a protected group for purposes of section 1981 and that they have a protectible interest for purposes of the fourteenth amendment. Under the circumstances, these assumptions are incorrect.

 Although the complaint is somewhat cryptic, apparently the Phelps are claiming they have a substantive interest in admission to law school. To have a property interest, one must "have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 83 L.Ed.2d 548 (1972). The cases discussing a student's property interest in his or her education appear to acknowledge a property interest only in continuing the education. *See Martin v. Helstad,* 699 F.2d 387, 389 n. 3 (7th Cir.1983); *Betts v. Board of Education of City of Chicago,* 466 F.2d 629, 633 (7th Cir.1972); *Hagopian v. Knowlton,* 470 F.2d 201, 209 (2d Cir.1972). The admission to a professional school is a privilege and not, standing alone, a constitutional or property right, subject to the exception that the rules and regulations for admission are not discriminatory, arbitrary or unreasonable. *Flemming v. Adams,* 377 F.2d 975 (10th Cir.), *cert. denied,* 389 U.S. 898, 88 S.Ct. 219, 19 L.Ed.2d 216 (1967). The Phelps do not challenge the standards employed by the admissions committee. Therefore, the Court holds the Phelps do not have a protectible interest under the fourteenth amendment.

The plaintiffs assert a cause of action under section 1981. While the Phelps claim that the admissions committee denied them admission in retaliation for their civil rights activities, the Court must examine the structure of this argument in somewhat more depth. The plaintiffs assert the following tautology: the plaintiffs' father and the family's law firm, Phelps-Chartered, are associated with blacks and the cause of civil rights; the plaintiffs in turn associate with their father and the law firm; therefore, the plaintiffs are so associated with blacks and civil rights as to have standing to sue under section 1981. In short, the plaintiffs explain that "Phelps equals Black," dk. no. 41, p. 20, and claim that they "should be accorded the benefit of minority status protection." Dk. no. 1, ¶ 8(j).

Parenthetically, the Court would note that these same plaintiffs have filed a separate suit, *Phelps v. Washburn University of Topeka,* Civil Action No. 84–4199, in which they accuse these same defendants of reverse discrimination. In Case No. 84–4199 the Phelps argue that they have been denied admission to the law school because of the affirmative action treatment given to black applicants. The Court finds it passing strange that in the present case the plaintiffs claim to be the victims of discrimination because they are considered black, while in Case No. 84–4199 the same plaintiffs claim to be the victims of discrimination from the same set of circumstances because they are white.

 The Court is familiar with the line of cases which hold that whites can sue under section 1981 for injuries arising out of their activities with or on behalf of blacks. *See, e.g., Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir.1979), *vacated on other grounds,* 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981); *DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306

(2d Cir.1975); *Gaito v. Kansas Power & Light Co.*, No. 79–4010 (D. Kan., *unpublished*, July 20, 1981). However, the Court has discovered no cases in which a party has attempted to claim protected status under section 1981 because the party has associated with another party who has associated with a protected class. The Court holds that the plaintiffs' vicarious minority theory does not state a cause of action because the Phelps are not a protected group under section 1981.

## IV. TIMOTHY PHELPS' RETALIATION CLAIM

In Case No. 83–4259, Timothy Phelps claims that he was retaliated against for having filed the previous suit, Case No. 83–4198, by not being accepted for admission to the law school from the waiting list. The Court finds that the uncontroverted facts entitle the defendants to summary judgment.

For the Fall of 1983, thirty-two people were placed on the waiting list. Those people with the top fifteen scores from the committee were ranked on the waiting list. Timothy Phelps was ranked fifth. It was the pre-established policy of the school to accept people off of the waiting list when the number of students who had committed to attending Washburn dropped below 185, the desired class size. The class size has never been increased to accomodate people who are on the waiting list.

In the Summer of 1983 no students were admitted off of the waiting list. A total of 200 students actually enrolled for the Fall class. Thus, even without accepting students from the waiting list, the law school obtained a Fall enrollment which exceeded the desired class size. Since no one was accepted from the waiting list and because no discretion entered into the decision not to accept students from the waiting list, the Court finds that no discrimination against Timothy Phelps occurred when he was not accepted from the waiting list.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment in Case No. 83–4198 is hereby granted.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment in Case No. 83–4259 is hereby granted.